**ID SECURITY SYSTEMS CANADA, INC., Plaintiff,**

v.

**CHECKPOINT SYSTEMS, INC., Defendant.**

No. CIV.A. 99–577.

United States District Court, E.D. Pennsylvania.

April 24, 2002.

Rudolph Garcia, J. Clayton Undercofler, III, Saul, Ewing, Remick & Saul, Philadelphia, PA, William A. De Stefano, Saul, Ewing, Remick & Saul, Philadelphia, PA, Francis X. Taney, Jr., Buchanan Ingersoll PC, Philadelphia, PA, for plaintiff.

C. Clark Hodgson, Jr., Patricia Casperson, Michael C. Chase, Keith R. Dutill, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for defendant.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

Plaintiff, ID Security Systems Canada, Inc. ("ID Security"), brought this federal antitrust and state law action against Checkpoint Systems, Inc. ("Checkpoint").

ID Security contends that Checkpoint has engaged in illegal monopolization and attempted monopolization and has conspired to restrain commerce in violation of the Sherman Antitrust Act with respect to electronic article surveillance ("EAS") tags. Additionally, ID Security contends that under Pennsylvania law Checkpoint interfered with its contract with a manufacturer of EAS tags, Tokai Electronics, Ltd. ("Tokai"), engaged in unfair competition and misappropriated its trade secrets.

The parties have filed a host of motions in limine concerning the admissibility of expert testimony and other evidentiary issues. Under the teachings of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the court held two days of hearings and heard oral argument. This memorandum addresses all the issues raised by the parties seriatim.

### I. *Standard for Admissibility of Expert Testimony*

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

The Supreme Court in *Daubert* imposed upon district courts the role of a gatekeeper, in order to "ensure that any and all

scientific testimony or evidence is not only relevant, but reliable." *Id.* at 589, 113 S.Ct. 2786. When "faced with a proffer of expert scientific testimony ... the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592, 113 S.Ct. 2786. This gatekeeping function of the district court extends beyond scientific testimony to "testimony based on ... 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999).

■ Federal Rule of Evidence 702 provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir.2000). The party offering the expert testimony has the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence. *See Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir.1999).

■ The first requirement, whether the witness is qualified as an expert, has been interpreted liberally to encompass "a broad range of knowledge, skills, and training." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741 (3d Cir.1994).

■ The second requirement provides that the expert's testimony is reliable. When the expert testifies to "scientific knowledge," the expert's opinions "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *In re Paoli*, 35 F.3d at 742 (citing *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786). In con-

sidering whether there are "good grounds" for the expert's opinions, district courts should look at a series of factors:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli*, 35 F.3d at 742 n. 8.

■ This list of factors "is non-exclusive and ... each factor need not be applied in every case." *Elcock*, 233 F.3d at 746. As the Supreme Court in *Kumho Tire* noted, the district court "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony." 526 U.S. at 152, 119 S.Ct. 1167. Because these factors were developed in the context of testing the reliability of scientific methods, they may not be easily applied when testing opinions concerning complicated business transactions and antitrust matters. *See ProtoComm Corp. v. Novell Advanced Serv., Inc.*, 171 F.Supp.2d 473, 477 (E.D.Pa.2001). Accordingly, "relevant reliability concerns may focus upon personal knowledge or experience," as opposed to "scientific foundations." *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167; *ProtoComm*, 171 F.Supp.2d at 478–79.

■ The final prong requires that the expert testimony "fit" by assisting the tri-

er of fact. *See Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000). "Admissibility thus depends in part upon 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Id.* (quoting *In re Paoli,* 35 F.3d at 743). The "fit" standard does not require plaintiffs to "prove their case twice." *Id.* They need not "demonstrate to the judge by a preponderance of evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that they are reliable." *In re Paoli,* 35 F.3d at 744. Thus, the test does not require that the opinion have "the best foundation" or be "demonstrably correct," but only that the "'particular opinion is based on valid reasoning and reliable methodology.'" *Oddi,* 234 F.3d at 146 (quoting *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 806 (3d Cir.1997)).

## II. *The Challenged Experts*

### A. *Liability Testimony of Martin A. Asher, Ph.D.*

ID Security intends to call Martin A. Asher, Ph.D., to testify as an expert in antitrust economics. Dr. Asher will testify to the relevant product and geographic market, Checkpoint's alleged monopoly power and injury to competition. Checkpoint does not dispute the qualifications or reliability of Dr. Asher, but contends that Dr. Asher's opinions fail the third prong of the Third Circuit's test, as they do not "fit" the facts of the case required Rule 702.

The dispute over "fit" revolves primarily around the relevant product market and the prices charged for tags by Checkpoint and ID Security. In the EAS industry, there are two types of products, acousto-magnetic ("AM") tags and radio frequency ("RF") tags. AM tags are exclusively produced by Sensormagic Electronics Corporation ("Sensormagic"). Checkpoint and ID Security both use RF technology. Both AM and RF systems require an initial investment of hardware and repeated purchases of tags. AM and RF tags, however, are not interchangeable, and thus once an individual customer purchases an RF system, the customer must purchase RF tags to use in that system.

Dr. Asher limits the relevant product market to RF tags because once an individual installs RF hardware, an RF tag is the only compatible tag with that system. Thus, when a customer purchases an RF system, it must necessarily purchase RF tags. It is unlikely, contends Dr. Asher, that customers would switch from an RF system to an AM system because of the large capital expenditures involved in purchasing the system's hardware. Dr. Asher concludes that once a customer purchases an RF system, that customer is "locked in" to purchasing RF tags.

Dr. Asher rebuts the argument that there is competition between AM and RF tags and thus that the relevant product market is that of the overall EAS system.[1] First, Dr. Asher concludes that there is no price competition between Checkpoint and Sensormagic on tags because, although their prices are the same—both charge $.035 per tag—the costs of manufacturing the tags are different. Checkpoint, Dr. Asher notes, produces its tags for a lower price than Sensormagic. If Checkpoint and Sensormagic were in competition, argues Dr. Asher, "that's a fight that Checkpoint could have won by undercutting the price of Sensormagic." Hr'g Tr., 3/7/02, at 117.

---

**1.** Within the entire market for EAS systems, Checkpoint controls approximately 40% of the market, while Sensormagic's share equals nearly 60%.

Second, Dr. Asher notes that consumers purchase the RF and AM systems for reasons other than price. Dr. Asher contends that the "primary drivers" in the market for EAS systems are "product characteristics, store characteristics, and technology." *Id.* at 120. Dr. Asher opines that supermarkets and drugstores, for example, are well suited for RF technology because RF technology provides integrated scan deactivation, allowing for easier and faster input in the check-out process. AM tags, in contrast, are deactivated by making contact with the tag and manually rubbing the label, which adds time to customer check-out.

Third, Dr. Asher notes that even if competition exists between Sensormagic and Checkpoint, both have an incentive to keep tag prices high because of the existence of large installed customer bases. *See id.* at 121–22. Checkpoint, who has sold over 350,000 RF systems, can keep tag prices high because it has a customer base that would incur significant capital costs to switch to an AM system. In a similar argument, Dr. Asher notes that although Checkpoint charges the same amount to both new and old customers—with the former apparently having a choice between AM and RF tags and the latter presumably "locked in" to an RF system—it can charge supracompetitive prices to all customers and risk losing some new business prices because the extent of the locked in customers.[2]

Dr. Asher points to failed attempts by several companies to enter the RF tag market and Checkpoint's reaction to their attempted entry to support his conclusion that Checkpoint, who has a 90% share in the RF tag market, charges supracompetitive prices. Dr. Asher states, "[t]here isn't entry into a market unless there are economic profits or excess profits; that is, prices above competitive levels." *Id.* at 109. In this case, Dr. Asher argues that, although the supracompetitive prices attract competitors into the market, the new entrants have been promptly eliminated from the market by Checkpoint's anticompetitive acquisition practices. As a result of Checkpoint's practices of quickly acquiring new entrants, these new competitors never had the opportunity to force a reduction of Checkpoint's supracompetitive prices.

Dr. Asher further opines that Checkpoint's prices are supracompetitive because Checkpoint's price per tag of $.035

2. At oral argument, counsel for ID Security noted that Checkpoint was obligated to sell to old and new customers at the same price as a result of the Robinson–Patman Act, preventing price discrimination. Checkpoint disputes this conclusion and contends that the Robinson–Patnam Act prohibits two kinds of price discrimination: primary line price discrimination and secondary line price discrimination. *See Precision Printing Co. v. Unisource Worldwide, Inc.,* 993 F.Supp. 338 (W.D.Pa.1998). Primary line price discrimination occurs when a seller charges one buyer higher prices than those charged to another buyer, in an effort to harm its competitors. *See Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 219–23, 113 S.Ct. 2578, 2586–88, 125 L.Ed.2d 168 (1993). The price to the favored customer must be a predatory price, meaning below variable cost. *See id.* at 220, 222–23, 113 S.Ct. 2578. Checkpoint contends that it could, although did not, charge different prices so long as its price was not predatory.

Furthermore, Checkpoint contends that secondary line pricing does not apply. Secondary line pricing occurs when the seller charges a higher price to one buyer than to another, when the two buyers are in competition with one another in the same geographic and product markets. *See Barr Lab., Inc. v. Abbott Labs.,* 978 F.2d 98, 106 (3d Cir.1992). Checkpoint notes that since there is no evidence that Checkpoint's new customers compete against Checkpoint's established customers in the same geographic and product markets, secondary line pricing discrimination is not applicable.

was higher than the price per tag of $.03 offered by ID Security. He first notes that ID Security's tag, manufactured by Tokai, was a higher quality tag than Checkpoint's because it did not reactivate after being deactivated. Notwithstanding the alleged higher quality tag, Dr. Asher contends that "it makes perfect economic sense to charge the going price and then from that point with the extra competition, the price would fall from that level." *Id.* at 111. Dr. Asher states that ID Security was enticed to enter the market at the price of $.03 per tag, which it thought was the existing market price. ID Security, he notes, actually entered $.005 below the market price as charged by Checkpoint. Dr. Asher opines that ID Security's entry into the market at $.03 per tag "demonstrates again that what [ID Security President Peter Murdoch] thought was plenty to entice him into entering this market was a price at 3 cents, not 3½, and again, this is strong support that the price of 3½ cents that Checkpoint was charging at the time was supracompetitive." *Id.* at 112. Checkpoint, however, points to contradictory evidence that ID Security actually sold its tags at higher than $.03, and that the only reference to a price at that level was an introductory flier noting a "special offer" of $.0295.

■ The standard for determining whether a witness may offer expert testimony does not require the proponent of the testimony to prove, with absolute precision, that the expert's opinion is correct. The court must determine only that the opinion is reliable. *See In re Paoli*, 35 F.3d at 744. The court finds that Dr. Asher has grounded his opinion on a reliable factual basis. His opinions are based on an economic model that considered the price variance between ID Security's tags and Checkpoint's, the technological differences between RF and AM systems, the

switching costs between AM and RF systems, and the EAS industry in general. The court concludes that Dr. Asher's testimony fits the facts of the case and that his testimony relating to Checkpoint's alleged antitrust liability should not be excluded.

### B. *Liability Testimony of Peter R. Greenhalgh*

■ ID Security challenges Checkpoint's expert on liability, Mr. Peter R. Greenhalgh. Like Dr. Asher, Greenhalgh has reviewed the record of the case, including depositions and documents from both ID Security and Checkpoint, analyzed the prices for both ID Security's and Checkpoint's tags, and studied the general EAS market. Greenhalgh's conclusions, however, are directly opposite to those of Dr. Asher. Greenhalgh opines that the relevant product market is the entire market for EAS systems. Furthermore, Greenhalgh concludes that within that market, Checkpoint's price is constrained by competition with Sensormagic, and thus its price per tag cannot be deemed to be supracompetitive. The court finds that although Dr. Asher and Greenhalgh reach different conclusions, both experts have grounded their opinions on a reliable factual basis. This quintessential battle of experts will need to be decided by the jury. *See Bracy v. Waste Mngmt. of Pa. Inc.*, Civ.A. No. 99–1189, 2001 U.S. Dist. LEXIS 5504, at *9–10, 2001 WL 877582, at * 3 (E.D. Pa. April 17, 2001).

Greenhalgh notes that the high switching costs between AM and RF systems and the incompatibility of the two systems do not alone mean that the RF tag market is the relevant product market in this case. Greenhalgh's approach looks to the market definition paradigm adopted by the Antitrust Division of the United States Department of Justice, which describes a relevant product market "as a product or group of

products such that a hypothetical profit-maximizing monopolist in the sale of such product(s) would likely impose a small, non-transitory increase in prices above competitive levels." Expert Report of Mr. Greenhalgh, at 5 (quoting Dep. of Justice and Fed. Trade Comm'n Horizontal Merger Guidelines (issued April 2, 1992, revised April 8, 1997), at § 1.1). To demonstrate that the market is broader than simply that of RF tags, and that there are market forces that constrain Checkpoint from charging supracompetitive prices on its RF tags, Greenhalgh points to the competition between Checkpoint and Sensormagic, the manufacturer and distributor of AM tags.

Greenhalgh argues that when consumers make the initial decision to purchase an EAS system, they factor into consideration the price of the entire system, including tags. *See* Hr'g Tr., 3/8/02, at 8–10. Greenhalgh relies on an interview with a former sales manager at Checkpoint, who indicated that customers are provided cost estimates for the price of tags and told how those prices relate to the cost of stolen merchandise. Greenhalgh suggests that customers are placed on notice that they must continually purchase tags and that the tags will cost $.035. Thus, when a customer considers whether to purchase an AM or RF system, the customer is aware of the future tag costs and makes his decision accordingly. Greenhalgh notes that there is evidence of this competition in the respective prices of tags by Sensormagic and Checkpoint. Both companies sell their tags for $.035 per tag. Greenhalgh argues that this is not an arbitrary price, but the result of two firms competing on price and of customers considering the price of tags over the life of their EAS system.

Greenhalgh also notes that new tag sales consist of only 23% of Checkpoint's reve-nues for EAS products. *Id.* at 7. Greenhalgh argues, then, that tag sales are not the driving force of Checkpoint's profit maximizing efforts, but rather that "[i]t's the new system sales that are driving the company." *Id.* In order to attract new customers and compete with Sensormagic on hardware, Greenhalgh opines that Checkpoint must keep its tag prices on a competitive level with Sensormagic. Thus, Greenhalgh concludes, the market for hardware constrains Checkpoint from raising its prices on tags.

Greenhalgh further argues that Checkpoint's prices are not supracompetitive in comparison to ID Security's price. Since ID Security intended to enter the market at a higher price than Checkpoint's, Checkpoint's price could not have been supracompetitive. Though his conclusion is different from Dr. Asher on this point, both experts look to the same set of reliable facts to draw informed and reasonable conclusions. Additionally, Greenhalgh states that one customer, a purchaser from Avery Dennison, noted that ID Security offered higher prices than Checkpoint. Finally, Greenhalgh disputes ID Security's price of $.0295 as noting that it was merely an introductory price.

ID Security raises a two-pronged challenge to Mr. Greenhalgh. First, ID Security argues that Greenhalgh's methodology is flawed because he does not base his conclusion with respect to the relevant product market on the appropriate legal standard. Specifically, ID Security argues that Greenhalgh's analysis of the relevant product market is contrary to the Supreme Court's decision in *Eastman Kodak v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), and therefore must be excluded as being based on a faulty methodology. Secondly, ID Security contends that Greenhalgh has not provided sufficient reliable facts, as re-

quired by *Kodak*, to demonstrate that the relevant product market is the overall market for EAS systems. ID Security notes that the methodology must be guided by the controlling legal principle, and to the extent that the expert ignores that principle, the expert's testimony fails *Daubert*'s test of a reliable methodology.

In *Kodak*, the Supreme Court confronted the issue of "whether a defendant's lack of market power in the primary equipment market precludes—as a matter of law—the possibility of market power in the derivative aftermarket." *Id.* at 455. *Kodak* involved claims under both §§ 1 and 2 of the Sherman Act.[3] There, the plaintiff alleged that even though Kodak faced competition in the market for equipment, its primary market, it wielded monopoly power in the derivative, or secondary market for parts and services, where it controlled an 85–90% share of that market. The Court rejected Kodak's argument that the aftermarket for parts and services could not be a relevant product market in which to assess plaintiff's § 2 claim. *Id.* at 481, 112 S.Ct. 2072. The Court determined that the relevant product market must be determined by the choices available to Kodak equipment owners. The Court noted that "because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed only of those companies that service Kodak machines." *Id.* at 481–82, 112 S.Ct. 2072. Indeed, the Court suggested that the relevant product market may constitute only one brand of a product. *Id.* The Court concluded, however, that "the proper market definition can be determined

only after a factual inquiry into the 'commercial realities' faced by consumers." *Id.* at 482, 112 S.Ct. 2072 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 572, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)).

■ Based on its reading of *Kodak*, ID Security argues that Greenhalgh failed to consider the Supreme Court's direction concerning relevant product markets by concluding that the relevant product market in this case consists of the market for EAS systems. As Checkpoint notes, however, the Supreme Court did not conclude that the secondary market must always be the relevant product market; rather, the Court determined only that, although as a matter of law the secondary market was not precluded from being considered the relevant product market in all cases, whether it was or not was a question of fact. The Third Circuit, applying *Kodak*, has noted that in situations involving primary and secondary markets, "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 440 (3d Cir. 1997). *See also Allen–Myland, Inc. v. Int'l Bus. Machs. Corp.*, 33 F.3d 194, 208 n. 16 (3d Cir.1994) (noting that the "true inquiry" in determining relevant product market is a factual one of whether a company is constrained by the prices of one product when pricing a secondary product). Whether the secondary market in this case constitutes the relevant product market under *Kodak* is a question of fact that the jury must determine after considering the "commercial realities faced by consumers" in the EAS industry.

---

**3.** Section 1 of the Sherman Act prohibits contracts and conspiracies in the restraint of trade. *See* 15 U.S.C. § 1. Section 2 prohibits monopolization, attempted monopolization and conspiracy to monopolize. *See* 15 U.S.C. § 2. The case sub judice implicates only Section 2 of the Sherman Act.

ID Security also contends that Greenhalgh's conclusions are not reliable as he has failed to make the appropriate factual inquiry. In looking at the relationship between the primary and the derivative, or secondary markets, the Supreme Court suggests that there are two factors that help explain the behavior of the primary and derivative markets for goods: information and switching costs. ID Security contends that Greenhalgh failed to investigate these factors adequately, rendering his testimony unreliable.

With respect to information costs, the Court notes that "[f]or the service-market price to affect equipment demand, consumers must inform themselves of the total costs of the 'package'—equipment, service and parts—at the time of the purchase; that is, consumers must engage in accurate lifestyle pricing." *Id.* at 473, 112 S.Ct. 2072. With regard to the second factor, switching costs, the Court states that "[i]f the costs of switching is high, consumers who already have purchased the equipment, and are thus 'locked in,' will tolerate some level of service price increases before changing equipment brands." *Id.* at 476, 112 S.Ct. 2072. The Court explains this scenario, noting that "a seller profitably could maintain supracompetitive prices in the aftermarket if the switching costs were high relative to the increase in service prices, and the number of locked-in customers were high relative to the number of new purchasers." *Id.*

Despite ID Security's assertions to the contrary, Greenhalgh addresses both switching and information costs in his analysis. With respect to information costs, Greenhalgh explains that customers are aware that they will incur tag costs throughout the life of the system. During the *Daubert* hearing, Greenhalgh testified:

> Yes, when they're buying these new systems they are given cost benefit analyses that show the profile of purchases like the profile over time and that they will be buying tags. So they're clearly on notice that they will be—to use these systems they've got to keep buying tags. And in response, many customers ask for a contract that establishes the price of that.

Hr'g Tr., 3/8/02, at 9–10. Thus, Greenhalgh contends that customers are not deceived by the costs of these tags, but are fully aware that they will need to purchase tags throughout the life of their RF system. Furthermore, Greenhalgh notes that Checkpoint's prices, for both old and new customers, have remained constant. These customers have not been subject to an initial price quote and then increased prices subsequent to the purchase of the hardware. Greenhalgh explains why such a tactic by Checkpoint, which would appear to be economically advantageous because of the high number of existing customers, would be economically irrational:

> If they established a reputation that as soon as you bought [the hardware] they started gouging you on tags, what would do—what would that do to their success in selling new systems? In essence, the market doesn't allow them to do that. If they're going to sell new systems and preserve the reputation in the competition with Sensormagic they are not—the market doesn't allow them to price those tags higher than what they allow—what they price for new systems.

*Id.* at 8–9.

Finally, Greenhalgh acknowledges that once customers purchase an RF system they must purchase RF tags. Even though the factors of incompatibility and switching costs are present, Greenhalgh opines that "there still can be factors that constrain a firm's prices irrespective of these." *Id.* at 5. Specifically, Greenhalgh notes that how a company forms its prices

is important. In this case, Greenhalgh contends that Checkpoint prices its product to compete with Sensormagic, and that although switching costs are inherent in the market, Checkpoint's price is constrained by its reputation and the information available to consumers.

Thus, the court concludes that Mr. Greenhalgh has considered the factors suggested in *Kodak,* and has based his conclusions on reliable information. Mr. Greenhalgh shall be permitted to testify to Checkpoint's alleged antitrust liability.

### C. *Damages Testimony of Samuel J. Kursh, D.B.A.*

Checkpoint objects to the testimony of Samuel J. Kursh, D.B.A., ID Security's damages expert. Dr. Kursh is expected to testify as to the losses incurred by ID Security as a result of Checkpoint's alleged misconduct. Dr. Kursh provides economic data for lost profits from lost sales of Tokai tags,[4] lost profits from lost sales of hardware, or equipment, and lost profits from lost sales of Laserfuse tags. Checkpoint contends that each of these lost profit conclusions is speculative and thus fails to satisfy the fit requirement of *Daubert.*

### 1. *Lost Profits from Lost Sales of Tokai Tags*

Dr. Kursh opines that the original two-year contract between ID Security and Tokai, which provided that ID Security would be the exclusive distributor of Tokai tags excluding tags sold in Asia and a fixed number of tags sold to Checkpoint, would have been extended for an additional ten years, until 2008. Dr. Kursh then computes his lost profit estimates, calculating a minimum and maximum amount of damages stemming from ID Security's federal

and state claims with respect to lost sales of Tokai tags. For the maximum amount of tags, Dr. Kursh determines the number of tags that would have been sold by ID Security by using Tokai's total tag output, minus the amount of tags Tokai was obligated to sell to Checkpoint and the sales in the Asian market. For the minimum figures, Dr. Kursh calculates the total number of tags actually sold by Checkpoint, subtracting Asian sales and Checkpoint's fixed number of tag sales. Dr. Kursh then factors in manufacturing costs, exchange rates, a price of $.0325 per tag and avoided costs to determine the total damages as a result of the federal and state claims. The difference between the federal claim damage estimates and the state claim damage estimates is merely a different calculation of present value. For the federal claims, Dr. Kursh reduces the economic losses to present value as of January 1, 2002, the estimated date of trial. For the state law claims, he reduces the economic losses to present value as of February 1997, the date of the alleged interference, then adjusts the figures to current dollars as of January 1, 2002. Dr. Kursh calculates that from 1997 through 2008, ID Security incurred maximum damages of $29,819,077 and minimum damages of $20,067,398 on the federal claims. For the state claims over the same period, Dr. Kursh suggests that ID Security incurred maximum damages of $17,254,546 and minimum damages of $11,445,021.

 In an antitrust action, a plaintiff must demonstrate both the fact of damages, or causation, and the amount of damages. *See Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 484 (3d Cir.1998). Dr. Kursh's proposed testimony implicates

---

4. Dr. Kursh in his report and testimony uses the term "label" and "tag" interchangeably to describe Tokai's RF product.

both of these elements of the cause of action. With respect to the fact of damages (or causation), Dr. Kursh essentially predicts that under ordinary circumstances, but for Checkpoint's conduct, the contract between ID Security and Tokai would have been extended beyond its expiration date and may have been extended as long as 2008. As to the amount of damages, Dr. Kursh calculates the amount of ID Security's lost profits based on the number of tags ID Security would have sold during the period the contract would have been in effect but for the alleged conduct by Checkpoint. Dr. Kursh's testimony as to the fact of damages and the amount of damages must be analyzed separately.

First, as to the fact of damages, Dr. Kursh bases his conclusion on research he conducted into the industry generally and Checkpoint, ID Security and Tokai, specifically. Dr. Kursh studied industry forecasts from Arthur D. Little, Inc., and reviewed production capacity and sales records for Checkpoint, ID Security and Tokai for this period. Based on this information, Dr. Kursh concludes that in the regular course of business "[i]t was anticipated that this contract would have been extended beyond [1999]." Expert Report of Dr. Kursh, at 10. Dr. Kursh notes that under an agreement entered into between Tokai and Checkpoint, Checkpoint provided Tokai with a license to produce certain tags until December 2008, and in return Tokai was obligated to sell a fixed number of tags to Checkpoint at $.01 per tag. By contrast, Tokai sold the same tags to ID Security at $.025 per tag. Since it cost Tokai $.02 cents to make each tag, Dr. Kursh concludes that Tokai made money selling to ID Security while it lost money selling to Checkpoint, *see* Hr'g Tr., 3/7/02, at 7–9, and thus "it was in Tokai's economic interest to renew this agreement [with ID Security] beyond [1999]." Expert Report of Dr. Kursh, at 2. Additionally, Dr. Kursh also notes that ID Security and Tokai had already manifested an intent to extend the contract beyond the first two years into the future by extending the contract once already, for one year, in January 1997. *See id.* at 8.[5]

---

**5.** There is evidence, however, to suggest that the contract would not have been extended. First, Dr. Kursh admits that although he predicts the contract would be extended for ten years, the parties had "issues" in their relationship in early 1997. *Id.* at 48. ID Security President Peter Murdoch wrote Tokai President Tadayoshi Haneda in February 1997 to express his concern that the two companies had "a fundamental disagreement." Hr'g Ex. D–25. Specifically, the parties disagreed as to whether ID Security allegedly owed money to Tokai due to the rejection by "important customers in the American market" of Tokai tags as a result of "the [poor] quality of the Tokai adhesive." *Id.* In the letter, Murdoch raised doubts as to Tokai's intention to "continue producing RF labels" and Tokai's intent "to honor its agreement to supply ID Security on an exclusive basis with certain 'source tag' materials." *Id.* Dr. Kursh contends that this adhesive problem "was solved sometime in early '97," Hr'g Tr., 3/7/02, at 20. It is, of course, for the jury to determine whether the relationship had mended such that the parties would have extended the contract.

Second, an ID Security business plan from late 1996 suggests that ID Security would sell the Tokai tag as a temporary measure in an effort to enter the RF tag market prior to the development of its Laserfuse tag. The plan notes that "[i]nitially, the Company will sell an RF label developed and manufactured by Tokai Electronics Corp. of Japan, pending the production mid–1997 of its own proprietary labels." Hr'g Ex. D–20. Dr. Kursh's response to the fact that the business plan contemplates only a short-term marketing of Tokai tags is that this business plan is "not a static document." Hr'g Tr., 3/7/08, at 43. Nevertheless, Dr. Kursh testified that the business plan does not specifically contemplate sales levels of Tokai tags in the range and for the period proposed by Dr. Kursh:

Q: Is there anything in the document that suggests it would be reasonable for us to

■ Dr. Kursh's expert opinion as to the fact of damages will be permitted in part and excluded in part. To the extent that Dr. Kursh will opine on whether extending the contract would have been in Tokai's "economic interest," the opinion will be allowed. Dr. Kursh reached this conclusion based upon a study of the industry and the business practices of Checkpoint, Tokai and ID Security. Checkpoint does not challenge Dr. Kursh's figures or the methodology. In fact, whether extending the contract is in Tokai's "economic interest" is just another way of saying that, under these circumstances, it was not only profitable to Tokai to sell tags to ID Security, but it was more profitable to sell tags to ID Security than the alternatives available to Tokai at the time. This conclusion satisfies the fit requirement in that it allows the jury to consider, as a factor, the economic incentive which Tokai had for extending the agreement with ID Security and if so, for how long a period would the contract have been extended. Since Dr. Kursh is a qualified economist, his opinion is based on reliable facts and his opinion "fits" the facts of this case, the court finds that Dr. Kursh may testify as to EAS industry practices, including the parties' business practices, Tokai's economic incentive to extend the contract and whether extending the contract with ID Security would have been more profitable than the alternatives available to Tokai.

Dr. Kursh's testimony as to the likelihood that the contract would have been extended beyond the expiration date for as long as the year 2008 presents an entirely different issue. To the extent that Dr. Kursh opines on the likelihood that the contract would have been extended and whether Checkpoint's conduct was a substantial factor in the parties decision not to extend the contract, this testimony will not be allowed. Whether the contract would have been extended or not, and, if so, the likely length of the extension, is not a proper subject for expert testimony in this case, in that the testimony will not assist the trier of fact. The basic tenet of Dr. Kursh's testimony is that a businessman in making rational business decisions will extend a contract with a party if doing so will yield him a higher profit than the alternatives available to him at the time. This opinion is simply another way of saying that in a free market rational businessmen will make decisions that will tend to maximize profits. This principle is so basic to our economic system that it hardly needs citation.[6] *See generally* Adam Smith, The Wealth of Nations (1776). To put it another way, Dr. Kursh's opinion on the role of the profit motive in driving business decisions in a free market, which he contends would control Tokai's conduct in its dealings with ID Security, offers only "generalized common sense" that "does not rise to the level of expert opinion solely because it is offered by someone with an academic pedigree." *Fedor v. Freightliner, Inc.*, 193 F.Supp.2d 820, 832 (E.D.Pa.

expect in light of what they say in the business plan that they would be buying volume of Tokai tags, non-laser fuse tags, at levels like 400 million as far out as ten years after the laser fuse came to the market?

A: There's nothing specific that says that. *Id.* at 45. Weighing this evidence, however, is the province of the jury.

6. Of course, if Dr. Kursh were to opine that a Japanese business such as Tokai, although operating in a similar capitalist environment, for reasons of tradition or culture or for any other indigenous reason would not be guided by this profit motive principle, then his opinion would be of assistance to the jury. No evidence that Tokai's conduct was driven by any such cultural considerations is present in the record.

2002) (Robreno, J.). *See also Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) (noting that "if all the primary facts can be accurately and intelligently described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience or observation in respect of the subject under investigation" then expert testimony may properly be excluded). Therefore, Dr. Kursh's explanation of the economic rationale driving Tokai's conduct, i.e. the profit motive, is not beyond the grasp of the ordinary juror and therefore will not aid the jury to gain a greater understanding of the dynamics which caused Tokai and ID Security not to renew this contract.

██ With regard to the amount of damages, Dr. Kursh opines that ID Security would sell either all of Tokai's output for the years 1997 through 2008 (for his maximum damages estimate) or the same amount of Tokai tags as Checkpoint sold for the same period (for his minimum damages estimate), subtracting from both figures Asian market sales and the fixed amount of sales to Checkpoint.[7]

Dr. Kursh contends that there is an appropriate factual basis for this prediction. First, Dr. Kursh notes that there is capacity in the market for expansion. Dr. Kursh states that Checkpoint sells as many as 3 billion tags a year, yet industry analyst Arthur D. Little estimated in 1994 "that the easily attainable market in the United States was 10 billion tags a year." Hr'g Tr., 3/7/02, at 16. Additionally, in his report, Dr. Kursh notes that although he used Checkpoint's sales figures as the ba-

sis for calculating ID Security's lost sales, ID Security's entry into the market as a secondary supplier would likely increase the overall market for RF tags. *See* Expert Report of Dr. Kursh, at 5–6. Second, Dr. Kursh contends that ID Security would have the capacity to sell the tags. Dr. Kursh notes:

> They have, between ID and their parent companies, they have distribution in 45 countries. They're planning to invest in salespeople and marketing with funds generated through an investment banker. So they're really gearing up to sell this product. And really their market thought here is to simply be a second-source supplier.

Hr'g Tr., 3/7/02, at 17.

Checkpoint contends that Dr. Kursh's estimates with regard to the quantity of tags sold by ID Security raises questions as to the reliability of his conclusions. Dr. Kursh opines that ID Security would have sold, at a minimum, between 135 million and 332 million tags per year between the year 1997 and 2008. *See* Expert Report of Dr. Kursh, at 7. Yet Dr. Kursh admits that ID Security's sales of Tokai tags was only 5 million in 1994, 10 million in 1995 and 16 million in 1996. *See* Hr'g Tr., 3/7/02, at 50. Nevertheless, Dr. Kursh responds that it is not appropriate in this instance to look at ID Security's prior sales performance because the contract with Tokai provided the company with a new business opportunity as worldwide distributor of Tokai tags that would greatly exceed its prior sales. *See id.* at 19–20.

Furthermore, although the contract commenced in April 1996, presumably opening up the door for dramatically increased sales in that year, the sales for

---

**7.** Kursh uses actual Tokai production figures and actual Checkpoint sales figures for his estimates for the years 1997 through 2001. Kursh holds the production and sales figures for 2001 constant for the remaining years.

1996 were not significantly larger for several reasons. First, there were problems with the adhesive on the Tokai tag, causing ID Security's customers to reject shipments of the tags. Dr. Kursh contends, however, that these problems were resolved by the beginning of 1997. *See id.* at 20–21. Second, although Checkpoint contends that the fact that ID Security had amassed an inventory of 50 million tags in 1996 suggests that ID Security was unable to sell the tags it purchased from Tokai, Dr. Kursh contends that it was important for ID Security to build up an inventory during this time, so that it could be a second supplier in the industry and provide prompt delivery to any customers. *See id.* at 20. Third, Dr. Kursh notes that ID Security was prepared to get financing from a third party, which would enable ID Security to expand its marketing force and take on the increased sales. *See id.*

In presenting its lost profit damages, ID Security is not required, for either its federal or state claims, to present its lost profit estimates with mathematical certainty. *See Scully v. U.S. WATS, Inc.,* 238 F.3d 497, 515 (3d Cir.2001) (noting that "mathematical preciseness" is not required in finding lost profits); *Scobell Inc. v. Schade,* 455 Pa.Super. 414, 421, 688 A.2d 715, 719 (1997) (explaining that lost profits are difficult to establish with "mathematical certainty"). Indeed, "in assessing damages, particularly those for lost profits, we recognize the inevitability of some imprecision of proof, and note that certainty as to the amount of damages is not required, particularly when it is the defendant's breach that has made such imprecision unavoidable." *Scully,* 238 F.3d at 515 (quoting *Commonwealth Assocs. v. Palomar Med. Tech., Inc.,* 982 F.Supp. 205, 208 (S.D.N.Y.1997)). The amount of damages may be demonstrated with reasonable certainty, so long as the evidence is not based upon speculation or guess work. *See In re*

*Lower Lake Erie Iron Ore Antitrust Lit.,* 998 F.2d 1144, 1176 (3d Cir.1993); *Merion Spring Co. v. Muelles Hno. Garcia Torres,* 315 Pa.Super. 469, 486, 462 A.2d 686, 695 (1983). In *Merion Spring,* the court cited approvingly the Restatement (Second) of Contracts' definition of speculative profits, noting that "speculative profits are those the evidence of which is so meager or uncertain as to afford no reasonable basis for inference." 315 Pa.Super. at 487, 462 A.2d at 696 (quoting Restatement (Second) of Contracts § 331 cmt c).

In calculating the amount of lost profits with respect to lost sales of Tokai tags, Dr. Kursh analyzed the EAS industry, including Checkpoint and ID Security. His damage estimates project that ID Security, as worldwide distributor of Tokai tags, would have sold the same number of tags as Checkpoint. ID Security need not demonstrate that Dr. Kursh's opinion is correct or precise, but only that it is reliable based upon the facts of this case and that it presents a reasonably certain estimate of ID Security's damages. The court finds that ID Security has met this burden and Dr. Kursh may testify at to the amount of lost profits incurred by ID Security as a result of lost sales of Tokai tags.

2. *Lost Profits from Lost Sales of Hardware*

■■■ Checkpoint also contests Dr. Kursh's conclusions with respect to lost hardware sales. Dr. Kursh opines that Checkpoint's alleged interference with ID Security's contract with Tokai resulted in lost hardware sales for ID Security from 1997 to 2006 in the amount of $8,728,954 for ID Security's federal claims and $4,523,778 for ID Security's state claims. Dr. Kursh contends that ID Security incurred these damages because "being a factor in the label market creates opportunity to sell hardware." Hr'g Tr., 3/7/02, at

21. Dr. Kursh then compares the hardware sales projections in ID Security's business plan with actual hardware sales in 2000 and estimates that actual sales would increase 15% per year.

Dr. Kursh opines that sales of tags translate into sales of hardware without providing any data to support his conclusions. He provides no rationale that ID Security would incur such damages, other than noting that it is "common sense economics" that lost tag sales would lead to lost hardware sales. Kursh Dep., 11/16/01, at 92. Nor does Dr. Kursh bring to his analysis a thorough understanding of ID Security's own hardware sales. On cross examination at the *Daubert* hearing, Dr. Kursh testified:

Q: Now, you don't know who manufactured this hardware, do you?

A: No.

Q: And you don't know anything about the quality of ID's hardware, do you?

A: Correct.

Q: And you don't know how well the ID hardware worked in detecting, do you?

A: I don't know the specifics of the hardware, no.

Q: And you don't know what it cost to make?

A: Correct. Well, we do know what the projected gross profits are, so we know what it cost to make.

Q: But despite not knowing who manufactured it and how good it was and those kind of things, you're comfortable projecting lost hardware sales?

A: Right.

Hr'g Tr., 3/7/02, at 55–56.

With regard to the calculation of the amount of lost profits owing to lost hardware sales, Dr. Kursh relies on ID Security's business plan, and then increases the figure 15% per year until 2006. Other than confirming that ID Security would sell "a little more" than it had previously projected, Dr. Kursh does not provide a factual foundation for the use of 15% as the increase in hardware sales. *Id.* at 22–23. The court concludes that Dr. Kursh's opinions concerning lost hardware sales are not based upon a reliable factual foundation. As a result, Dr. Kursh will not be permitted to testify as to ID Security's lost profits as a result of lost hardware sales.

### 3. *Lost Profits from Lost Sales of Laserfuse Tags*

█ Finally, Dr. Kursh opines that Checkpoint's interference with ID Security's contract delayed the production of ID Security's Laserfuse tag. The cause of this delay was, according to Dr. Kursh, twofold. One, Tokai and ID Security agreed at the time they extended the contract from the original two years to the third year that they would share their technologies and work to develop the Laserfuse tag. When Checkpoint purchased Tokai, Dr. Kursh explains, that cooperation ended. Two, Dr. Kursh contends that Checkpoint entered into an agreement with Tokai's parent company, Tokai Aluminum, which provided that Tokai Aluminum would not sell to anyone the laminate used to make the Laserfuse tags. Thus, without the cooperation from Tokai in solving technical problems and without the laminate from Tokai Aluminum, ID Security's production of the Laserfuse tag was delayed. *See id.* at 24, 28–32. Dr. Kursh concludes that it took ID Security four years to recover from this interference. *See id.* at 25.

Checkpoint also urges rejection of Dr. Kursh's damages estimate of lost Laserfuse tag sales. Checkpoint contends that Dr. Kursh's opinions are not based upon a reliable factual basis and are grounded solely on information provided by ID Secu-

rity President Peter Murdoch. First, Checkpoint argues that Dr. Kursh fails to identify properly the source of the Laserfuse tag damages. Checkpoint contends that the contract that Checkpoint allegedly interfered with was between ID Security and Tokai, yet Dr. Kursh attributes the damages to Checkpoint's interference with not only Tokai, but also Tokai Aluminum, Tokai's parent company, who was not a party to the contract allegedly interfered with by Checkpoint. Dr. Kursh responds that the damages stem from both the termination of the cooperative technology-sharing relationship between ID Security and Tokai and from the refusal of Tokai Aluminum to supply ID Security with the components necessary to make the Laserfuse tags. Dr. Kursh notes that although ID Security did not have a direct contract with Tokai Aluminum, such a contract was not necessary because ID Security had access to Tokai Aluminum's products through its relationship with Tokai. *See* Hr'g Tr., 3/7/02, at 61–62. When that relationship ended, Dr. Kursh suggests, so did the ability of ID Security to get the components necessary for the Laserfuse tags.

Checkpoint also questions the amount of damages and the volume of Lasertags that Dr. Kursh projects. Checkpoint contends that this information is based entirely upon numbers given to Dr. Kursh from ID Security President Peter Murdoch and should be excluded because Dr. Kursh did not test the figures' reliability. *See JMJ Enter., Inc. v. Via Veneto Italian Ice, Inc.*, Civ.A. No. 97–0652, 1998 U.S. Dist. LEXIS 5098, at *19, 1998 WL 175888 at *7 (E.D. Pa. April 15, 1998) (excluding expert who did not verify the accuracy of the informa-

tion in tax returns). Indeed, Dr. Kursh testified that with respect to Laserfuse tags, the production volumes, sales and number of tags came from Murdoch. *See* Hr'g Tr., 3/7/02, at 58. Nevertheless, Dr. Kursh contends that he satisfied himself that the projections were accurate by conducting an analysis of the industry and viewing a videotape of tag production. *See id.* at 64. In *JMJ*, the court found that the expert "knew very little about JMJ's industry," failed to "perform or review any market surveys or studies," and "did not conduct or review any research on the [defendant's] industry." 1998 U.S. Dist. LEXIS 5098, at *20, 1998 WL 175888 at *7. Although in this case Dr. Kursh did not perform any market surveys, he did conduct research on the industry, including interviewing industry participants and reviewing industry forecasts from Arthur D. Little. *See* Hr'g Tr., 3/7/02, at 6. He also reviewed the Laserfuse technology and the Laserfuse production process. *See id.* at 64–65. The court concludes that with respect to lost Laserfuse tag sales Dr. Kursh bases his conclusions on a reliable factual basis and has sufficiently tested the information provided to him from ID Security President Murdoch. Dr. Kursh may testify at trial as to lost profits stemming from lost sales of Laserfuse tags.

### D. *Damages Testimony of Peter R. Greenhalgh*

■ ID Security challenges the damages testimony of Peter R. Greenhalgh, Checkpoint's liability and damages expert. ID Security contends Mr. Greenhalgh's opinions are not supported by the factual record and are not based upon valid or reliable methodology.[8] In his report,

---

**8.** ID Security also argues that Greenhalgh does not meet the minimum qualifications necessary to testify as an expert as to ID Security's alleged damages because he makes

a series of legal conclusions in his report. Specifically, Greenhalgh notes in his report that (1) ID Security can have no damages based on an alleged breach of a void contract;

Greenhalgh analyzes Dr. Kursh's report and provides an independent analysis of likely damages in this case. ID Security contends that Greenhalgh's conclusions are not based on any factual basis, but merely state unsupported conclusions. The court finds that Greenhalgh's conclusions are based upon a reliable factual basis and that his assumptions fit the facts of the case.

Greenhalgh notes that the contract between ID Security and Tokai was only a two-year contract in which "both sides were unhappy with the other's performance." [9] Hr'g Tr., 3/7/02, at 71. Additionally, Greenhalgh relies on ID Security's own business plan as evidence that ID Security did not intend to stay with Tokai indefinitely, but instead intended to use the Tokai tags as a transitional tag until ID Security started selling its own Laserfuse tags. *Id.* at 72–73. With respect to the volume of tags, Greenhalgh opines that ID Security would not have been able to sell as many Tokai tags as Checkpoint sold for several reasons. First, Checkpoint sold the tags worldwide, while ID Security's own business plan suggested it would focus only on North and South America. *See id.* at 74. Second, the Tokai tags had an adhesive problem, which "was a considerable problem for customers for North America." *Id.* Third, Greenhalgh cites the deposition of a tag customer in this

case who noted that ID Security charged higher prices than Checkpoint. *See id.* at 75. Greenhalgh then compares these obstacles with the prior sales of ID Security in the tag market, and determines that based on sales of 16 million and an unsold inventory of 50 million tags in 1996, it was unreasonable to assume that ID Security would sell approximately 350 million tags in 1997. *See id.* at 76–77. Thus, Greenhalgh concludes that ID Security did not incur any damages as a result of the alleged interference by Checkpoint:

> Keeping on storing these tags in inventory is not the way to make money, and given the technical problems with the product, the adhesive problems, the high cost, the high priced strategy, it is highly unlikely that continuing to buy more would have actually resulted in more profit for the firm.

*Id.* at 84.

Greenhalgh also disputes Kursh's lost hardware sales conclusions. Again, Greenhalgh points to ID Security's own business plan that indicated that hardware sales and tag sales should be considered separately. The reason, notes Greenhalgh, is that ID Security sells hardware through individual dealers, while ID Security sells tags directly to customers. *See id.* at 78. Additionally, Greenhalgh notes that to the extent that ID Security at-

---

(2) ID Security's lost sales projections are speculative; (3) ID Security's Laserfuse tags likely infringe upon Checkpoint's patents; and (4) Checkpoint's conduct was not the cause of any damages to ID Security. With respect to the first and third opinions listed by ID Security, Greenhalgh has cited expert reports to support his conclusions. Greenhalgh explained at the *Daubert* hearing that it is customary for economic experts to rely on other expert reports when drawing conclusions. *See* Hr'g Tr., 3/7/02, at 85. With respect to his conclusions regarding the speculative nature of lost sales and the cause of ID Security's damages, Greenhalgh notes that

these opinions relate not to legal causation, but to the economic consequences that result from the underlying action. *See id.* at 81–82.

**9.** Greenhalgh also testified at the *Daubert* hearing that Tokai President Tadayoshi Haneda considered there to be sufficient grounds to end the agreement between Tokai and ID Security at this time. In so testifying, Greenhalgh relied on the Haneda affidavits. Because the court finds that the Haneda affidavits are not admissible, *see infra* III.A, Greenhalgh may not rely on those affidavits for his opinions.

tempted to be a second supplier of tags, most of these customers already had hardware. Thus, while ID Security's potential customers may have purchased tags, Greenhalgh suggests that they would not have purchased additional hardware. Based on these factors, Greenhalgh concludes that "I didn't see any connection between tag sales and hardware sales. That didn't seem to be the mode of business operation that they were employing." *Id.*

Greenhalgh opines that with respect to lost profits on the sale of Laserfuse tags, ID Security would not have incurred the damages as projected by Dr. Kursh. Instead, Greenhalgh suggests that Tokai's involvement in Laserfuse development was minimal, and that according to ID Security's business plan, it was Phillips, not Tokai, with whom ID Security hoped to develop the Laserfuse tags. *See* Hr'g Tr., 3/7/02, at 80. ID Security challenges this conclusion by noting that, according to a letter by Murdoch in January of 1997 in which Murdoch attempted to memorialize the terms of an agreement reached in Amsterdam, the parties had agreed to share technology in the development of the Laserfuse tag. Greenhalgh opines that, based on the refusal of Haneda to sign the letter memorializing the terms of the agreement, such terms were never actually agreed upon. *See* Hr'g Tr., 3/7/02, at 88–89.

Upon consideration of Greenhalgh's opinions relating to lost profits as a result of lost sales of Tokai tags, hardware and Laserfuse tags, the court concludes that Greenhalgh has based his conclusions on a reliable factual basis and that the opinions "fit" the facts of the case. With respect to lost Tokai tags, Greenhalgh relies on the length of the original contract, ID Security's prior sales of Tokai tags, ID Security's marketing plan, deposition testimony relating to the price of ID Security's tags and ID Security's inventory to conclude that ID Security did not suffer any damages from Checkpoint's alleged interference. While ID Security disputes the inferences drawn from these facts, and the weight to be given them, these factual disputes are to be resolved by the jury. It is sufficient, however, to note that Greenhalgh's conclusions are based on a reliable factual basis. Greenhalgh's conclusions relating to lost hardware sales are also based on a reliable factual foundation as Greenhalgh examines ID Security's own business and marketing plans to reach his conclusions.

Finally, with respect to lost Laserfuse tag sales, Greenhalgh opines that, based upon ID Security's business plan, Tokai did not play a significant role in the future development of Laserfuse. Additionally, Greenhalgh points to the problems between Tokai and ID Security and the refusal of Haneda to sign Murdoch's January 1997 letter as evidence that an additional agreement between Tokai and ID Security never existed. While ID Security also disputes these conclusions, whether there was an agreement to cooperate on the Laserfuse tag is a question of fact for the jury. Nevertheless, Greenhalgh's opinion is based upon a reliable factual basis. The court determines that his opinion is based on good grounds and, therefore, he will be permitted to testify to damages incurred by ID Security as a result of Checkpoint's alleged conduct.[10]

E. *Expert Testimony of Leslie L. Kasten, Jr.*

ID Security seeks to preclude all evidence concerning the validity of the

---

10. With regard to the lost sales of Laserfuse tags, Greenhalgh may not rely on the affidavits of Haneda. *See supra* note 9.

Laserfuse patent and the testimony of Checkpoint's patent expert, Leslie L. Kasten, Jr. The validity of the Laserfuse patent, however, is not at issue in this case. *See* Hr'g Tr., 3/8/02, at 33. Checkpoint concedes that the Laserfuse patent is valid and states that it will not raise the issue of validity at trial. Nevertheless, Checkpoint contends that the Laserfuse tag, if produced prior to November 22, 1998, would have infringed upon Checkpoint's own patent, which lapsed on that date as a result of Checkpoint's failure to pay the maintenance fee. Checkpoint argues, then, that ID Security could not have incurred damages with regard to lost Laserfuse tag sales until after Checkpoint's patent lapsed.[11]

Kasten opines that prior to November 22, 1998, ID Security's Laserfuse tag would have infringed upon United States Patent No. 5,367,290 (" '290 patent"), which was owned by Checkpoint. The Laserfuse tag is disclosed in United States Patent No. 5,734,327 (" '327 patent"). In analyzing whether the Laserfuse tag would have infringed upon the '290 patent, Kasten re-

lies on a claim chart in which he compares claim 1 of the '290 patent with the principal embodiment of the Laserfuse tag as provided in Fig. 1 of the '327 patent. He opines that the chart "clearly demonstrates that the Laserfuse tag, if built in accordance with Fig. 1 of the '327 patent, would infringe at least claim 1 of the '290 patent." Expert Report of Mr. Kasten, at 11. Additionally, Kasten opines that the structure of a Laserfuse tag made in accordance with the embodiment of Figs. 2–4 of the '327 patent would include the structural features of Fig. 1 and would, consequently, infringe on at least claim 1 of the '290 patent for the same reasons. *See id.* at 12.

ID Security argues that Kasten's testimony should be excluded because he did not follow a proper methodology in comparing the infringing product—a Laserfuse tag—with the '290 patent.[12] First, ID Security notes that in an infringement analysis, an expert must compare the allegedly infringing product to the claims of the patent. *See, e.g., Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1341 (Fed.

11. Checkpoint contends that ID Security's motion is moot because it relates only to validity and not to infringement. To the contrary, ID Security argues that its motion is sufficiently broad to encompass both issues and that its reply brief addressed both validity and infringement specifically. Additionally, to the extent that the motion does not cover infringement, ID Security moved to amend its motion at the *Daubert* hearing. *See* Hr'g Tr., 3/8/02, at 37. At the hearing, the court heard testimony from Mr. Kasten and from ID Security's patent expert Mr. Kenneth N. Nigon on infringement. The court concludes that ID Security's memoranda and argument at the hearing properly raised the infringement issue such that the motion is not moot.

12. ID Security also challenges Kasten's infringement analysis on the grounds that he erred by misconstruing the term "breakdown point" as used in the '290 patent. ID Security contends that the term "breakdown point"

in the '290 patent is a functional term and that, so considered, the Laserfuse tag could not infringe upon the '290 patent because the '290 patent and the Laserfuse tag function differently. Kasten contends, however, that "[a]s defined in the ['290] patent, the term 'breakdown point' is a physical structure, not a functional feature." Hr'g Tr., 3/8/02, at 60. The interpretation of the term "breakdown point" raises a question for the court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577(1996). The application of that properly construed term, however, is a question of fact. The court, upon consideration of the infringement analysis conducted by Kasten, which is based upon the claim chart comparing the '290 patent with the preferred embodiment of the '327 patent, determines that Kasten's opinion is sufficiently reliable so as to permit its introduction.

Cir.2001) (noting that in an infringement analysis the "fact-finder compares the properly construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device"). Kasten admits that when conducting his infringement analysis, he compared the '290 patent to a description of the Laserfuse tag, rather than to a tag itself. Kasten notes, however, that he was told by counsel for Checkpoint that no Laserfuse tag existed, other than the one tag that ID Security President Peter Murdoch carried with him. *See* Hr'g Tr., 3/8/02, at 68. ID Security also argues that Kasten examined only a small portion of Murdoch's deposition testimony and did not review Murdoch's deposition testimony on September 26, 2001, in which he revealed that samples of Laserfuse tags were in production.

Second, ID Security notes that Kasten did not consider the prosecution history of the '290 patent. Kasten testified that he did not think it necessary to review the prosecution history because he "felt that the intrinsic evidence of the claims themselves, the way the claim terminology was clearly defined in the specification and the drawings, was more than adequate to reach a conclusion on literal infringement." *Id.* at 71.

The court concludes that Kasten followed a sufficiently rigorous methodology in this case to reach his conclusions. Although Kasten did not compare the claims of the '290 patent with an actual Laserfuse tag, he testified that in conducting his infringement analysis, he compared the '290 patent to the preferred embodiment and drawings of the '327 patent. *See* Hr'g Tr., 3/8/02, at 71. Indeed, ID Security has refused to provide Kasten and Checkpoint with any samples of the Laser-

fuse tag. ID Security may not, on one hand, argue that Kasten's methodology is insufficient for failing to analyze the actual Laserfuse product (or failing to consider Murdoch's deposition testimony that Laserfuse tag samples were in production) and, on the other hand, withhold production from Kasten of the actual tags.

The court also concludes that Kasten's failure to review the prosecution history of the '270 patent is not fatal to his testimony. The starting point for claim interpretation is the language of the claims. *See Johnson Worldwide Assocs. v. Zebco Corp.,* 175 F.3d 985, 989 (Fed.Cir.1999). Claim terms "are to be given their ordinary and accustomed meaning." *Id.* Nevertheless, "arguments and amendments made during prosecution of a patent application must be examined to determine the meaning of terms in the claims." *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir.1995). However, "claim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invite reference to those sources." *Johnson Worldwide,* 175 F.3d at 989–90. Kasten admitted that he did not examine the prosecution history. *See* Hr'g Tr., 3/8/02, at 71. Nevertheless, Kasten did analyze the plain terms of the '290 patent and compared those terms with the preferred embodiment of the Laserfuse tag. His conclusion, based on a reading of the claims of the '290 patent, was that the Laserfuse tag would have literally infringed upon the terms of that patent. *See id.* at 71–72.

The court concludes that ID Security's motion will be granted to the extent that Checkpoint is precluded from introducing evidence that the Laserfuse tag is invalid, but will be denied with respect to the issue

of infringement.[13] Kasten will be permitted to testify to whether the Laserfuse patent would have infringed upon the '290 patent. Furthermore, in light of the dispute concerning the meaning of the term "breakdown point" of the '290 patent, the court will hold a *Markman* hearing to determine the proper interpretation of the '290 patent claims.

### F. *Expert Testimony of E.L. Jurkowitz*

ID Security seeks to preclude the testimony of Dr. E.L. Jurkowitz, who will testify that irrespective of Checkpoint's conduct, Marleau, Lemire Securities Inc. ("Marleau Lemire"), who provided ID Security with a financing commitment, would have abandoned its commitment to ID Security and the financing would not have been extended.

In December 1996, ID Security received a financing commitment from Marleau Lemire that was "subject to the satisfactory completion of [Marleau Lemire's] due diligence."[14] Def. Resp. in Opp'n to Pl.'s Mot. to Preclude Test. by Dr. E.L. Jurkowitz, Ex. E. In February 1997, Checkpoint issued a press release in which Checkpoint announced that it was the exclusive distributor of Tokai tags. ID Security contends that as a result of the press release, Marleau Lemire abandoned its financing commitment. Checkpoint argues, however, that Marleau Lemire never conducted the due diligence upon which the financing commitment was conditioned, and, if it had, Marleau Lemire would not have extended financing. Checkpoint thus offers the testimony of Dr. Jurkowitz to support this assertion.

ID Security's challenge to Dr. Jurkowitz addresses all three of the prongs of *Daubert*. First, ID Security contends that Dr. Jurkowitz does not have the minimum qualifications of an expert in the relevant field because he is not an expert in venture capital and investment banking. Instead, ID Security suggests that Dr. Jurkowitz is the president of a market research firm, without experience in financing. ID Security argues that although he may have assisted his clients in providing information requested as a result of due diligence inquiries, he has never actually conducted a due diligence inquiry and thus does not satisfy the practical experience requirement of *Daubert*. Checkpoint counters that Dr. Jurkowitz holds a doctorate in economics with distinction from Columbia University, has experience in corporate strategic planning and market research and has assisted in various early stage companies in raising financing in the range

---

13. ID Security also challenges Kasten's methodology and reliability as a result of his erroneous conclusion that the '327 patent would likely be invalid, had the patent examiner reviewed the prior art in this case. In fact, the patent examiner did consider the prior art, notably, a foreign equivalent of the '290 patent. Nevertheless, although ID Security contends that this methodology goes to the overall reliability of the expert, this erroneous opinion does not affect the methodology or reliability of Kasten's infringement analysis and does not require the exclusion of Kasten's testimony.

14. Due diligence is "such a measure of prudence, activity, or assiduity, as it properly to be extended from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case." Black's Law Dictionary 457 (6th Ed. 1990). Due diligence consists of an investigation on the part of parties "before consummating an agreement or transaction to ensure that representations made are true and accurate." *First Options of Chicago, Inc. v. Wallenstein,* Civ.A. No. 92–5770, 1997 U.S. Dist. LEXIS 2051, at *18, 1997 WL 89115 at * 7 (E.D.Pa. Feb. 28, 1997).

of $2 to $5 million range. *See* Expert Report of Dr. Jurkowitz, Ex. A.

Second, ID Security challenges Dr. Jurkowitz's methodology in reaching his opinion that had Marleau Lemire performed a due diligence analysis, ID Security would not have been provided financing. Checkpoint notes that Dr. Jurkowitz, did identify the generally accepted steps that an investment banker would follow during a due diligence analysis, including legal evaluation of any agreements and review of correspondence, reports cited in plaintiff's business plan and press releases. ID Security also asserts that Dr. Jurkowitz did not evaluate the due diligence that was conducted. Checkpoint contends that Dr. Jurkowitz was unable to review documents related to the due diligence conducted by Marleau Lemire because although Checkpoint attempted to locate documents maintained by Marleau Lemire's successor corporation, Peelbrooke Capital, Inc., it was unable to do so. Checkpoint notes, however, that Dr. Jurkowitz did review deposition testimony of ID Security President Peter Murdoch as well as Donald McDonald and James Dorran, both employees of Marleau Lemire.

Finally, ID Security argues that Dr. Jurkowitz's assumptions are unsupported by the record. ID Security challenges the conclusion that its financing would have been revoked because it failed to pay its invoices to Tokai. ID Security notes that the failure to pay the invoices to Tokai was the result of Tokai sending defective labels, for which ID Security rightfully refused to pay. Checkpoint counters that this argument actually supports its position, noting that because of the defective labels and the difficulties that ID Security was having with Tokai, Marleau Lemire, had it been aware of this information, would not have provided the capital.

The arguments advanced by the parties raise essentially three issues. First, what are the generally accepted practices and standards relied upon by investment bankers when conducting due diligence review? Second, was the due diligence completed by Marleau Lemire in this case? Third, if the due diligence was not completed by Marleau Lemire, would completion of due diligence have qualified ID Security for the financing under the terms of the letter of December 16, 1996, by Marleau Lemire, except for the information contained in Checkpoint's February 1997 press release?

As to the first issue, the qualifications requirement of Rule 702 has been interpreted liberally. *See Elcock*, 233 F.3d at 741. A trial court may not exclude expert testimony "simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. Steamship Co., Inc.*, 80 F.3d 777, 782 (3d Cir.1996). Dr. Jurkowitz is qualified to identify the steps an investment banking firm would take when conducting due diligence. He is an expert in financing and has, in his report, set forth several factors that investment banking firms consider when conducting due diligence. As a result, he may opine as to the generally accepted practices and standards in conducting due diligence and may set forth the factors considered by investment banking firms and the weight, if any, investment banking firms give each factor. The court determines that, as required by Rule 702, Dr. Jurkowitz possesses skill or knowledge "greater than the average layman" and that his testimony will assist the trier of fact.

With regard to the second issue, Dr. Jurkowitz may evaluate the practices and standards used by investment banking firms when conducting due diligence and

opine on whether or not due diligence was completed in this case by Marleau Lemire. As an expert in financing, Dr. Jurkowitz is qualified to analyze the steps taken by Marleau Lemire and compare those steps to the generally accepted practices and standards relied upon by investment bankers for conducting due diligence. He may thus offer an opinion as to whether the investigation undertaken by Marleau Lemire in regard to ID Security constituted a full and complete due diligence analysis.

Finally, Dr. Jurkowitz may opine on whether, if Marleau Lemire had completed due diligence, ID Security would have qualified to receive the financing outlined in the letter of December 16, 1996, excluding the information contained in the Checkpoint press release.[15] Dr. Jurkowitz may evaluate the factors relied upon by investment banking firms and opine on whether ID Security would have qualified to receive the financing it requested excluding the information contained in the Checkpoint press release.[16] Dr. Jurkowitz is an expert in finance and his opinion will assist the jury in determining whether ID Security was a qualified candidate for financing. Unlike the testimony of Dr. Kursh, who sought to assist the jury by opining on a matter of basic economic principles, Dr. Jurkowitz's testimony implicates complex and technical questions as to which the average juror lacks familiarity and understanding. Thus, Dr. Jurkowitz's testimony would assist the jury in reaching a determination as whether, if Marleau Lemire had completed due diligence, ID Security would have qualified for financing but for Checkpoint's press release.

### G. Expert Testimony of John A. Olah, Esq.

Checkpoint seeks to preclude the expert testimony of John A. Olah, Esq., on the grounds that his opinions do not meet the standard for expert testimony set forth in *Daubert*. Olah's expert report renders an opinion on the substantive law of Ontario and then applies law to a set of facts in this case. In doing so, Olah concludes that based on Ontario law, the contract between ID Security and Tokai was in effect when Checkpoint entered into the exclusive agreement with Tokai in February 1997, the oral modification of ID Security's contract with Tokai in Holland in 1997 was valid and that the amount of damages awarded against Checkpoint shall be reduced only by the amount Tokai paid in settlement with ID Security. ID Security notes that Olah will not be called to testify as an expert witness before the jury at trial, but instead, that his report and testimony shall be offered to the court to assist

---

**15.** The parties disagree as to whether Marleau Lemire, in fact, completed the due diligence. Ultimately, the question of whether Marleau Lemire had completed due diligence is a jury question. If the jury determines that Marleau Lemire had, in fact, completed due diligence and that ID Security had satisfied the condition of the December 16, 1996, letter, then the opinion offered by this expert would not be relevant to this proceeding. If Marleau Lemire had completed due diligence and agreed to provide the financing, then it does not matter whether or not it had done so negligently or inadequately. Therefore, the court will instruct the jury that if it determines that Marleau Lemire had, in fact, completed due diligence, then Dr. Jurkowitz's testimony on the issue of whether ID Security qualified for financing under the December 16, 1996, letter *is irrelevant and must not be considered by the jury.*

**16.** In reaching his conclusion that ID Security would not have qualified for financing, Dr. Jurkowitz relies on the affidavits of Tadayoshi Haneda. Because the court has concluded that the Haneda affidavits are inadmissible, *see infra* III.A, Dr. Jurkowitz may not base his opinion on the content of the Haneda affidavits.

in the determination of Ontario law. *See* Fed.R.Civ.P. 44.1.

■ Federal Rule of Civil Procedure 44.1 provides:

> A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Fed.R.Civ.P. 44.1. The rule provides the framework for the court to determine the law of foreign jurisdictions, should issues of foreign law arise. Prior to the enactment of this rule, the determination of foreign law was a question of fact. *See* 9 Wright and Miller, Federal Practice and Procedure, § 2441. The rule sought "to abandon the fact characterization of foreign law and to make the process of determining alien law identical with the method of ascertaining domestic law to the extent that it is possible to do so." *Id.* at § 2444. Thus, when a district court is called upon to determine foreign law, the court need not be bound by the Federal Rules of Evidence and may look to any relevant material or source, including expert testimony. *See Reebok Int'l, Ltd. v. McLaughlin,* 49 F.3d 1387, 1392 n. 4 (9th Cir.1995).

■ To the extent that Olah opines on the substantive provisions of Ontario contract law, and provided, of course, that Ontario contract law applies in this case, Olah's report may assist the court in making a determination as to the substance of Ontario law. *See* Fed.R.Civ.P. 44.1. Olah's report, however, extends beyond providing an analysis of Ontario law, as it also offers to assist the fact finder as to which facts to find largely based upon the testimony by ID Security President Peter Murdoch. To the extent that Olah seeks to find or assist the court in finding the facts of this case, Olah's testimony invades the province of the fact-finder and it is not an appropriate function of expert testimony under Rule 44.1.

In *Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery,* 177 F.R.D. 245, 264 (D.N.J.1997), vacated in part on other grounds, 179 F.R.D. 450 (D.N.J.1998), the court was confronted with a similar situation, in which the plaintiff sought to introduce an expert report on foreign law pursuant to Rule 44.1. As in this case, the expert also sought to assist the fact-finder as to which facts to find in the case. The court recognized "that use of an expert report to assist the court in its determination of foreign law is entirely different from use of an expert report, pursuant to Rule 702, Fed.R.Evid., to aid the jury in determining facts." *Id.* The court noted that if it were to introduce the report to the jury, "this report will subvert the jury's function in that it is the responsibility of the jury, not [the expert], to determine what the facts are in light of the applicable law." *Id.* Therefore, the court refused to admit the report into evidence, but did not preclude the plaintiff from presenting the report to the court to assist in the determination of foreign law, pursuant to Rule 44.1. *See id.*

Accordingly, Olah's testimony and report will be admitted to the extent that it assists the court in determining the substantive law of Ontario. The testimony and report will be disallowed, however, to the extent that it seeks to guide the court in determining the facts of this case.

### III. *Other Evidentiary Motions*

In addition to the motions in limine seeking to preclude the introduction of ex-

pert witnesses pursuant to *Daubert,* the parties have also filed several other motions seeking to preclude the introduction of certain evidence. Specifically, ID Security seeks to preclude the affidavits of Tadayoshi Haneda. Checkpoint seeks to preclude any evidence of Checkpoint's enforcement of its patents, the affidavit of Lukas A. Geiges and the testimony of Messrs. Angel and de Nood.

### A. *Affidavits of Tadayoshi Haneda*

■■■ ID Security seeks to exclude the affidavits of Tadayoshi Haneda, a former Checkpoint officer and previous president of Tokai. The affidavits were filed in 1997 during litigation in Canada between ID Security and Tokai for alleged breach of Tokai's obligations under an exclusivity agreement. ID Security notes that the case settled prior to ID Security being able to cross-examine Haneda on the statements made in the affidavits. Haneda, who is now in Japan and, according to the parties, is beyond the reach of compulsory process, refuses to testify in this matter. The parties agree that they have gone to lengths to secure his testimony but there are no available court processes to compel his appearance. *See* Hr'g Tr., 3/8/02, at 173. Because the court finds that the affidavits do not have the equivalent circumstantial guarantees of trustworthiness as statements covered in Federal Rules of Evidence 803 and 804, the affidavits of Haneda are not admissible and ID Security's motion will be granted.

The statements in Haneda's affidavits are hearsay and not subject to any of the specific exceptions to the hearsay rule. Checkpoint contends, however, that the statements are admissible under Federal Rule of Evidence 807, the residual exception to the hearsay rule. Rule 807 provides:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 807. In order to satisfy this rule, the purported evidence must meet five requirements: trustworthiness, materiality, probative importance, interest of justice and notice. *See Coyle v. Kristjan Palusalu Maritime Co., Ltd.,* 83 F.Supp.2d 535, 545 (E.D.Pa.2000), *aff'd* 254 F.3d 1077 (3d Cir.2001). Nevertheless, Congress intended this exception to "be used very rarely, and only in exceptional circumstances." *Id.* Indeed, as Judge Pollak has instructed, "[a] catch-all rule such as Rule 807 must be sparingly invoked, lest its potential breadth swallow the carefully crafted narrowness of the enumerated exceptions." *Russo v. Abington Mem. Hospital Healthcare Plan,* Civ.A. No. 940195, U.S. Dist. LEXIS 18595, at *9, 1998 WL 967568 at *3 (E.D.Pa. Nov. 16, 1998).

The dispute over Haneda's affidavits implicates, primarily, the interest of justice and trustworthiness prongs of the Rule 807 requirements.[17] With respect to the

---

**17.** The statements in the affidavits are both material and probatively important because they concern the precise issue in this case, namely the relationship between Tokai and ID Security. The statements in the affidavits directly contradict the statements of ID Security President Peter Murdoch relating to the relationship between ID Security and Tokai and the events surrounding the two companies' meeting in Amsterdam. Finally, the notice

interest of justice prong, both sides advance persuasive arguments as to why the affidavits should or should not be admitted. Checkpoint contends that the affidavits of Haneda provide the only opportunity for Checkpoint to present its side of the story concerning the relationship between ID Security and Tokai. The affidavits address not only what occurred at the meeting in Amsterdam in early 1997, where Haneda was the only participant who was present other than representatives of ID Security, but also what transpired throughout the course of the relationship between the two parties, including the obligations and performance of the original two-year contract and whether the contract was ever extended to include a third year. Checkpoint pleads that to exclude these affidavits would result in a trial based upon half-truths.

On the other hand, ID Security contends that to introduce the affidavits of Haneda would result in the admission of a one-sided view that, in contrast to the deposition and trial testimony of Peter Murdoch, has never been tested on the crucible of cross examination. To let these documents into evidence, contends ID Security, would allow Checkpoint to present uncontested and untested statements, against which neither ID Security nor any other party has had an opportunity to challenge directly.

The crux of this argument, then, is whether the documents are sufficiently trustworthy. If they are, then ID Security would be able to counter the assertions contained within the affidavits by introducing its own evidence, such as the testimony of Murdoch. The jury would determine which version of events to credit. If the affidavits are not trustworthy, however, then to allow them into evidence would not

provide the "other half" of the truth, but merely place before the jury self-serving and likely untruthful statements that do not reflect the actual circumstances and events which they purport to describe.

The Third Circuit has discussed the application of Rule 807 in circumstances that resemble the situation in the case at hand. In *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 111–13 (3d Cir. 2001), the Third Circuit upheld the admission under Rule 807 of an affidavit made by the plaintiff's former president, who had died prior to trial. *Id.* The plaintiff in that case sought the introduction of the affidavit in an effort to counter the defendant's assertions of what had transpired at meetings that were attended by the former president. *Id.* at 111–12. In addressing the trustworthiness prong of Rule 807, the trial court in *Bohler–Uddeholm* pointed to seven factors that made the affidavits in that case trustworthy:

> (1) the declarant was known and named, (2) the statement was made under oath and penalty of perjury, (3) the declarant "was aware of the pending litigation at the time he made the declaration and thus knew that his assertions were subject to cross examination," (4) the statements were based on personal observation, (5) the declarant was not employed by the plaintiff at the time of the statements, and thus had no financial interest in the litigation's outcome, (6) the affidavit was corroborated, partially, but minutes of directors meetings (some statements [the declarant] said were made match others' notations), and (7) his position and background qualified him to make the assertions.

*Id.* at 113. The Third Circuit determined that the district court did not abuse its

discretion in permitting the introduction of the affidavit. *See id.*

In the case at bar, Haneda executed the statements under oath and penalty of perjury. Furthermore, to the extent that the affidavits note Haneda's reflection of the events at the Amsterdam meeting and the ongoing relationship between ID Security and Tokai, the affidavits also are based on his personal knowledge of those events and circumstances.[18]

Nevertheless, *Bohler–Uddeholm* is distinguishable, primarily based on the fifth factor annunciated by the trial court: that the declarant "was not employed by the plaintiff at the time of the statements, and thus had no financial interest in the litigation's outcome." *Id.* at 113. In this case, Haneda was Tokai's president and a member of Tokai's board of directors at the time he took the affidavits. As such, at the very moment that he swore the affidavits, he was employed by the party on whose behalf he filed the affidavits and therefore had a "financial interest" in the outcome of the case. *Id.*

Also troubling is Haneda's refusal to cooperate in this case and the reason advanced for not cooperating. Haneda's re-

fusal to cooperate with the parties in the instant case, apparently as a result of an employment dispute with Checkpoint, does not speak well of Haneda's regard for legal proceedings.[19] This apparent willingness to withhold testimony to fit his purpose is probative of the trustworthiness of his earlier testimony. To put it another way, if Haneda is now willing to thumb his nose at the legal system to fit his purpose (i.e. to withhold testimony to punish a party who terminated his employment), the court may legitimately question the trustworthiness of his testimony in an earlier proceeding where he also had an incentive to shape his testimony to fit his purpose.

Accordingly, the court concludes that the affidavits do not provide circumstantial guarantees of trustworthiness and are subject to the very risks that the hearsay rule is designed to prevent. Mr. Haneda's affidavits are not admissible and ID Security's motion will be granted.

### B. *Checkpoint's Enforcement of its Patents*

■ Checkpoint seeks to prevent ID Security from introducing evidence that

---

**18.** ID Security also argues that Haneda makes statements in the affidavits that are not based on his personal knowledge, thus not meeting the personal knowledge requirement of *Rule 807* nor the requirement in Rule 602. ID Security notes that Haneda makes several assumptions and conclusions for which he has no personal knowledge, but it would seem that as Checkpoint notes, Haneda had personal knowledge of the events of the Amsterdam meeting, where he was the sole representative of Tokai, and of his involvement with ID Security. Checkpoint argues that to the extent that the affidavits suggest that there were problems in the relationship between ID Security and Tokai, this fact was corroborated by Peter Murdoch, who in the February 1997 letter wrote to Haneda that the two companies had a "fundamental disagreement." Hr'g Ex. D–25.

**19.** In a letter dated May 12, 2001, written in Japanese and addressed to counsel for Checkpoint, Haneda wrote:
> I received your letter postmarked in America May 12, 2001.
> I was mentioned as the former president of Tokai Electronics in your letter. Not only was I not the president of that company, but I do not know a company by that name. I was the representative director of Checkpoint Manufacturing Japan with the main office at Chigasaki-si, Kanagawa-ken. However I was fired without notice—in a manner not impartial—in December, 1991. If Checkpoint Systems is the parent company of Checkpoint Manufacturing Japan and asks for my cooperation, I do not respond to their requests.
> I would like this letter to conclude our communications.

Checkpoint had enforced its patents. ID Security suggests that by enforcing its patents, Checkpoint engaged in anticompetitive conduct. Under ordinary circumstances, a patent holder who brings an infringement action to enforce its patent rights is "exempt from the antitrust laws, even though such a suit may have an anticompetitive effect." *In re Independent Serv. Org.*, 203 F.3d 1322, 1325 (Fed.Cir. 2000). There are two exceptions: (1) a patent owner seeking to enforce a patent may be liable under the antitrust laws if it can be shown that the asserted patent was obtained through fraud, *see Nobelpharma v. Implant Innovations*, 141 F.3d 1059, 1068–69 (Fed.Cir.1998); and (2) the patent infringement suit falls within the "sham" exception, *see In re Independent*, 203 F.3d at 1325. To fall within that second exception, the antitrust plaintiff must prove that the suit was both "objectively baseless and subjectively motivated by a desire to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy." *Id.*

■ There is no evidence in the record that Checkpoint or anyone else committed fraud on the Patent and Trademark Office. Nor has ID Security demonstrated that Checkpoint's patent lawsuits constituted "sham" litigation. Since neither of the exceptions applies, Checkpoint's conduct in bringing infringement actions to enforce its patents is exempt from the antitrust laws, and any evidence of its infringement actions is irrelevant and therefore must be excluded.[20] Checkpoint's motion to exclude any evidence of Checkpoint's enforcement of its patents therefore will be granted.

### C. Lukas A. Geiges Affidavit

Checkpoint seeks to preclude the introduction of an affidavit by Lukas A. Geiges, Checkpoint's Senior Vice President of International Business Development from 1994 to 1998. Checkpoint seeks to preclude the introduction of his affidavit on the grounds that it is not based on personal knowledge, is hearsay that does not fall under any exception and is unfairly prejudicial. This motion, however, is premature because it is uncertain whether or not Mr. Geiges will attend trial. If Mr. Geiges attends trial, then this motion is moot. Accordingly, the court denies this motion without prejudice, and Checkpoint may reassert this motion at trial, in the event Mr. Geiges is not a witness in this case.

### D. Trial Testimony of Messrs. Angel and de Nood

Checkpoint also seeks to exclude the trial testimony of Messrs. Angel and de Nood. This motion is likewise premature, because Messrs. Angel and de Nood are located in the Netherlands and have continually expressed no interest in this litigation and are likely not to appear at trial.

---

**20.** ID Security contends that evidence of Checkpoint's enforcement of its patents should be allowed, because such evidence may be admissible where the patent holder engages in an "overall scheme to use the patent to violate antitrust laws," *Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572, 1576 (Fed.Cir.1990). ID Security, however, does not provide any evidence of Checkpoint's enforcement of its patents. Similarly, despite asserting that Checkpoint's contentions "are almost as weak as those asserted recently by Microsoft," ID Security does not provide a factual basis for this conclusion. Finally, without citing any authority to support its position, ID Security argues that Checkpoint's patent enforcement is useful to explain why barriers of entry are high and why Checkpoint has a high market share. ID Security asserts that "there is no basis for excluding evidence of the patent litigation when used for those purposes, whether or not such evidence would be admissible solely to prove anticompetitive conduct." ID Security's argument lacks any authority to support its position.

This motion is denied without prejudice. Checkpoint may reassert this motion at trial if either Mr. Angel or Mr. de Nood appear for trial.

## IV. Conclusion

For the reasons stated above, the court finds that Martin A. Asher, Ph.D., and Mr. Peter R. Greenhalgh, the parties' liability experts, both may testify as to Checkpoint's alleged antitrust liability. Mr. Greenhalgh may also testify to damages incurred by ID Security as a result of Checkpoint's alleged conduct. Samuel J. Kursh, D.B.A., may testify to ID Security's lost profits stemming from lost sales of Laserfuse tags but may not testify as to lost profits as a result of lost hardware sales. With regard to lost Tokai tag sales, Dr. Kursh may testify as to EAS industry practices, including the parties' business practices, Tokai's economic incentive to extend the contract and whether extending the contract with ID Security would have been more profitable than the alternatives available to Tokai. Dr. Kursh, however, may not testify that the economic incentive to Tokai would have resulted in ID Security and Tokai extending the contract and that the extension would have been until 2008.

The court further finds that Checkpoint may not introduce evidence contesting the validity of the Laserfuse tag patent but may introduce evidence, including the testimony of Leslie L. Kasten, Jr., as to whether the Laserfuse tag would have infringed upon United States Patent No. 5,367,290. This testimony, however, is subject to the court's determination, following a *Markman* hearing, of the term "breakdown point." Dr. E.L. Jurkowitz may testify to the generally accepted practices and standards relied upon by investment bankers in the conduct of due diligence, whether Marleau Lemire's conduct constituted a full and complete due diligence analysis and whether, if due diligence had been completed, ID Security would have qualified to receive the financing it requested but for the information contained in the Checkpoint press release.

Moreover, the testimony and report of John A. Olah, Esq., will be admitted to the extent that it assists the court in determining the substantive law of Ontario. The testimony and report of Mr. Olah will be disallowed, however, to the extent that it seeks to guide the court in determining the facts of the case. The court will exclude the affidavits of Tadayoshi Haneda and any evidence relating to Checkpoint's enforcement of its patents. Finally, the court will defer its ruling on whether to exclude the affidavit of Lukas A. Geiges and the trial testimony of Mssrs. Angel and de Nood until the time of trial.

An appropriate order follows.

## *ORDER*

**AND NOW,** this **24th** day of **April, 2002,** for the reasons stated in the court's memorandum dated April 24, 2002, it is hereby **ORDERED** that:

1. Defendant's motion in limine to exclude the expert testimony of John A. Olah, Esquire (doc. no. 99) is **GRANTED IN PART** and **DENIED IN PART**.

2. Defendant's motion in limine to preclude expert testimony of Martin A. Asher, Ph.D., (doc. no. 100) is **DENIED**.

3. Defendant's motion in limine to preclude expert testimony of Samuel J. Kursh, D.B.A., (doc. no. 101) is **GRANTED IN PART** and **DENIED IN PART**.

4. Plaintiff's motion in limine to preclude testimony by Dr. E.L. Jurkowitz (doc. no. 102) is **DENIED**.

5. Plaintiff's motion in limine to preclude expert testimony by Peter R. Green-

halgh on damages issues (doc. no. 103) is **DENIED**.

6. Plaintiff's motion in limine to preclude expert testimony by Peter R. Greenhalgh on liability issues (doc. no. 104) is **DENIED**.

7. Plaintiff's motion in limine to preclude all evidence and testimony contesting the validity of the Laserfuse patent at trial (doc. no. 105) is **GRANTED IN PART** and **DENIED IN PART**.

8. Defendant's motion in limine to preclude evidence relating to Checkpoint's enforcement of its patents (doc. no. 106) is **GRANTED**.

9. Plaintiff's motion in limine to preclude evidence of purported affidavits of Tadayoshi Haneda (doc. no. 111) is **GRANTED**.

10. Defendant's motion in limine to preclude evidence of the Lukas A. Geiges affidavit (doc. no. 118) is **DENIED WITHOUT PREJUDICE**.

11. Defendant's motion in limine to preclude the trial testimony of Messrs. Angel and de Nood (doc. no. 129) is **DENIED WITHOUT PREJUDICE**.

**AND IT IS SO ORDERED.**

### *ORDER*

AND NOW, this 24th day of **April, 2002**, upon consideration of defendant's motion to reopen discovery (doc. no. 140), plaintiff's response to defendant's motion (doc. no. 141), defendant's reply memorandum (doc. 143) and plaintiff's surreply (doc. no. 144), it is hereby **ORDERED** that defendant's motion (doc. no. 140) is **GRANTED**.

It is **FURTHER ORDERED** that the defendant shall redepose Peter Murdoch, for a maximum of three hours, on the limited issue of the production and sale of Laserfuse tags.

It is **FURTHER ORDERED** that plaintiff shall produce 24 Laserfuse tags forthwith, pursuant to the Confidentiality Agreement and Order of April 20, 2000. There shall be no intrusive or destructive tests on these tags until a stipulation is entered into pursuant to the court's direction.

**AND IT IS ORDERED.**