Harry P. GALENTINE, Jr., Plaintiff,

v.

The ESTATE OF William
R. STEKERVETZ,
Defendant.

No. CIV.A.99–589–JJF.

United States District Court,
D. Delaware.

July 22, 2003.

Peter E. Hess, Esquire of Peter E. Hess, Wilmington, DE, for Plaintiff.

Thomas P. Leff, Casarino, Christman & Shalk, P.A., Wilmington, DE, for Defendant.

## *OPINION*

FARNAN, District Judge.

### Introduction

Plaintiff, Harry P. Galentine, commenced this action on September 2, 1999, against the Estate of William R. Stekervetz, the Estate of Lisa K. Hertzog, Sea Ray, Inc., Sea City Marina, Inc. and Rehoboth Bay Marina, Inc. alleging negligence and claiming property damage arising from a fire which occurred on September 2, 1997. All claims against Defendants, Estate of Lisa K. Hertzog, Sea Ray, Inc., Sea City Marina, Inc. and Rehoboth Bay Marina, Inc. have been dismissed. (*See* D.I. 21, 69, 77, 79). A bench trial was conducted concerning Plaintiff's negligence claims against Defendant, Estate of Stekervetz, on May 14 through May 15, 2003. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law.

### I. Facts

Plaintiff, Harry P. Galentine and William Stekervetz were boat owners whose boats were moored in adjacent slips at the Rehoboth Bay Marina ("Marina") in Dewey Beach, Delaware. (D.I. 90 at 1). In the early morning of September 2, 1997, a fire broke out on Mr. Stekervetz's boat while it was docked at the Marina. (Transcript of Bench Trial May 14 –15, 2003 ("Tr.") at 27–30). That morning the Plaintiff's boat, "Rush," was docked at the Marina immediately adjacent to Mr. Stekervetz's boat. Mr. Stekervetz and Lisa Hertzog, who were on the boat at the time of the fire, were trapped on the Stekervetz boat and died. (D.I. 64 at 1). The fire

from Mr. Stekervetz's boat ultimately spread to "Rush," completely engulfing the boat in flames. (D.I. 64 at 1). Unable to extinguish the fire on "Rush" with the available hose, "Rush" was towed into Rehoboth bay where it ultimately sank. (D.I. 64 at 1).

The Plaintiff commenced this action alleging negligence against various Defendants. The only remaining Defendant is the Estate of Stekervetz ("the Estate"). The Plaintiff alleges that Mr. Stekervetz was negligent in failing to properly maintain his boat. Specifically, the Plaintiff alleges that Mr. Stekervetz failed to repair his boat's defective wiring and ignored repeated warnings not to use the boat or its major appliances until extensive repairs to the wiring were made. (D.I. 98 at 2). The Estate contends that the Plaintiff has not met its burden of proof with respect to his negligence claim. Namely, the Defendant contends that Plaintiff has failed to prove the element of causation. Further, the Estate argues that the Plaintiff has not met his burden with respect to proving actual damages.

## II. Motions in Limine

The Estate has made several motions in limine. As a result, the Court will address the motions prior to its discussion of negligence.

### A. Estate of Stekervetz's Motion to Strike the Expert Testimony of Frank Gaworski (D.I. 120).

The Estate contends that the testimony[1] of Plaintiff's expert, Frank Gaworksi, should be excluded under Federal Rule of Evidence 702 ("Rule 702"). (D.I. 120 ¶ 7–

8). Specifically, the Estate argues that since Mr. Gaworski has no experience in inspections of electrical wiring on boats and marine units, has no knowledge of the relevant codes or standards for electrical systems on marine vessels, has no post-highschool education, and has only ten hours of training on investigation of the cause and origins of fires, his testimony does not meet the standard set forth in Rule 702, and therefore, should be excluded. (D.I. 120).

In response, the Plaintiff contends that Mr. Gaworski's experience and the fact that he has made hundreds of cause and origin investigations for the State Fire Marshal for over a decade meets the standard under Rule 702 for the admission of expert testimony. Further, Plaintiff argues that all of the authority cited by the Estate to preclude Mr. Gaworski's testimony involves cases in which the expert lacked the requisite training and experience in the particular field. (D.I. 122 at 3). Finally, the Plaintiff contends that even if Defendant's objection concerning Mr. Gaworski's expertise is valid in any way, it should go to the weight of his testimony as opposed to its admissibility. (D.I. 122 at 3).

Rule 702 governs the admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is

---

**1.** In lieu of live testimony from Frank Gaworski, a deposition taken on August 8, 2001, in connection with a wrongful death action in Lancaster, Pennsylvania, arising out of the same fire, was admitted into evidence, without any further objection from the Defendant, but still subject to Defendant's motion in limine to strike Mr. Gaworski's testimony under Rule 702. Thus, Defendant's Motion to Dismiss for Failure to Produce an Expert for Deposition (D.I. 118) will be denied as moot.

based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed.R.Evid. 702; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (discussing factors relevant to determining admissibility of expert testimony).

Rule 702 provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir.2000). The first requirement of Rule 702 involves an inquiry as to whether the witness is qualified as an expert. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741 (3d Cir.1994). The second requirement involves an inquiry as to whether the expert's testimony is reliable. *Id.* at 742. "The final prong of Rule 702 requires that the expert testimony 'fit' by assisting the trier of fact." *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys.*, 198 F.Supp.2d 598, 602–603 (E.D.Pa.2002) (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir.2000)).

The Estate challenges Mr. Gaworski on the first requirement of Rule 702–that the proposed witness be an expert. The first prong of the Rule 702 analysis involves an inquiry into whether the proposed witness has sufficient knowledge, skill, training, education or experience to testify with authority on the particular issue on which he or she proposes to opine. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir.1994). The Third Circuit has held that "a broad range of knowledge, skills, and training" will qualify a witness as an expert and the court has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." *Id.* Thus, the qualifications requirement of Rule 702 has been liberally construed in the Third Circuit.

*See, e.g., Holbrook v. Lykes Bros. Steamship Co., Inc.*, 80 F.3d 777, 781 (3d Cir. 1996); *Hammond v. International Harvester Co.*, 691 F.2d 646, 653 (3d Cir.1982).

■ According to his deposition testimony, Mr. Gaworski has worked with the Middle Department Inspection Agency for sixteen years, taught classes at the New Castle County Vocational School from 1986–1995 on residential wiring, commercial wiring and industrial motor controls, has his national certification in residential wiring for code enforcement officials, is an instructor at the Middle Department Inspection Agency, and has taken a ten hour course at the University of Delaware for cause and origin of fire investigation. (Frank Gaworski Deposition ("Gaworski Dep.") at 7–9). The Court concludes that given the liberal qualifications requirement under Rule 702, and the Third Circuit's willingness to accept general qualifications, Mr. Gaworski has the proper experience, training and skill to opine about the electrical wiring on the Stekervetz vessel as a possible origin of the fire on September 2, 1997. Further, in the Court's view, any deficiencies in Mr. Gaworski's qualifications such as the fact that he has no experience in marine electrical wiring goes to the weight of his testimony rather than its admissibility.

The Estate also challenges Mr. Gaworski's factual basis to offer an opinion regarding the cause and origin of the boat fire. (D.I. 120 ¶¶ 8–9). However, in its motion, the Estate does not elaborate on this challenge, rather it merely alleges that Mr. Gaworski lacks the proper factual foundation to offer his proposed opinion on the cause of the fire and challenges the relevance and reliability of his opinion. *Id.* Thus, the Court will address the final two requirements under Rule 702.

The factors which should be taken into account in regard to reliability, the second prong of Rule 702, are as follows:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Elcock v. Kmart Corp.*, 233 F.3d 734, 745–46 (3d Cir.2000) (quoting *In re Paoli*, 35 F.3d at 742 n. 8).

The Third Circuit has stated that this list of factors is non-exclusive and each factor does not have to be applied in every case. *Elcock*, 233 F.3d at 745–46. Further, because these factors were formulated in the context of determining the reliability of a scientific method, they are not easily applied to other contexts, and therefore, the reliability inquiry must be a flexible one. *See, e.g., Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 152, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999) (noting that the reliability inquiry of Rule 702 is a flexible one because there are many different fields of expertise and the factors considered must be "tied to the facts" of the case.) (citation omitted); *Elcock*, 233 F.3d at 745–46 (noting that the reliability inquiry under Rule 702 is flexible); *ProtoComm Corp. v. Novell Advanced Serv., Inc.*, 171 F.Supp.2d 473, 477 (E.D.Pa.2001) (stating that because the *Daubert* "factors were developed in the context of testing the reliability of scientific methods, they may not be easily applied when testing opinions concerning complicated business transactions and antitrust matters."). Thus, the relevant reliability

concerns of a particular case, "may focus upon personal knowledge or experience," rather than "scientific foundations." *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167.

■ In this case, according to Mr. Gaworski's testimony, he inspected the electrical wiring of the Stekervetz vessel on the morning of the fire. (Gaworski Dep. at 16–34). Specifically, he testified that he and two other individuals "traced every wire out as to what location it ended at. We cut the floor out of the boat to trace it underneath the floor [and][w]e removed devices that were still in place." (Gaworski Dep. at 20). Based on his deposition testimony, the Court understands that the purpose of Mr. Gaworski's inspection was to determine if there was any electrical activity on any of the wiring in the Stekervetz vessel. (Gaworski Dep. at 22) (stating that "the conductors did have electricity on it and that was the only electrical activity that I could find at that point...."). Given Mr. Gaworski's experience in electrical work, and the fact that he inspected the Stekervetz vessel on the morning of the fire, the Court finds that his testimony is sufficiently reliable and based upon a proper factual foundation as required under Rule 702. Further, the Court notes that the Estate has not specifically challenged the methodology of Mr. Gaworski's inspection technique.

■ The third prong of the Rule 702 inquiry "requires that the expert testimony 'fit' by assisting the trier of fact." *Checkpoint Sys.*, 198 F.Supp.2d at 602–603 (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir.2000)). Admissibility under this standard depends in part on the proffered connection between the test result to be offered and the particular factual disputes of the case. *Oddi*, 234 F.3d at 145 (quoting *In re Paoli*, 35 F.3d at 743). However, this standard does not require that the plaintiff prove that the opinions of

their experts are correct, rather they only have to demonstrate that they are reliable. *Id.* In this case, although it is disputed whether Mr. Gaworski offers an ultimate opinion as to the cause and origin of the fire, his opinion regarding where he found electrical activity on the wiring in the Stekervetz vessel is clearly relevant to the factual disputes in the case, *i.e.* the cause of the fire. Given Mr. Gaworksi's electrical experience and his inspection of the vessel on the morning of the fire, the Court concludes that this proffered testimony is reliable and will assist the trier of fact. Based on this, the Court concludes that Mr. Gaworski's proffered deposition testimony is admissible under Rule 702. Accordingly, the Estate's Motion in Limine to Strike the Expert Testimony of Frank Gaworski (D.I. 120) will be denied.

### B. The Estate of Stekervetz's Motion in Limine to Dismiss Plaintiff's Claims for Personal Property and Equipment Damages. (D.I. 119).

██ The Estate contends that the Plaintiff has failed to establish a sufficient factual foundation for his claims of personal property and equipment damages. Specifically, the Defendant argues that, although Plaintiff claims personal property and equipment damages of $25,020.96, the only documentation supporting his claim is a conclusory list of items and values compiled for purposes of litigation. Although the Estate has requested further documentation such as financial records, receipts and inventories, it has not been provided. Also, the Defendant contends that the Plaintiff violated the Court's Order which Ordered the Plaintiff to "produce all documents relevant to the issue of damages, including financing statements, insurance inventories and value estimates, by November 12, 2002." (D.I. 100 at ¶ 9). The Estate argues that because the Plaintiff has failed to provide any further documentation of damages

apart from his compiled list, he has violated the Court's Order, and as a result, it is within the Court's discretion to sanction the Plaintiff under Federal Rule of Civil Procedure 37(b) and (d) and dismiss the Plaintiff's damages claims.

In response, the Plaintiff argues that the Motion in Limine is really a case dispositive motion, and therefore, is not timely filed. (D.I. 123 at 1). As to the merits of the motion, the Plaintiff contends that he has submitted a list of the property that was on his vessel, Rush, at the time of the fire. Plaintiff contends that he also provided information on the present day replacement values; portions of the Used Boat Price Guide ("BUC"), the maritime "bluebook"; printouts from the Internet listing similar fishing equipment values on the market to establish comparable value; and a detailed declaration explaining that many of the records relative to the equipment on Rush were destroyed in the fire while others were lost when Plaintiff divorced and moved from his marital home. (D.I. 123 at 1–2). Further, the Plaintiff argues that he has noticed the appearance of two witnesses who will independently corroborate the presence and value of Mr. Galentine's personalty and equipment on Rush and asserts that despite this, the Defendant has not attempted to depose either individual. (D.I. 123 at 2). Finally, Plaintiff contends that expert testimony is not required to establish the value of items that can be purchased on the open market and also argues that the Federal Rules of Evidence allow for judicial notice of such facts, which are capable of ready and accurate determination through objective sources. (D.I. 123 at 2).

The Court concludes that the Estate's motion to dismiss is a dispositive motion that was untimely filed because it was filed after the dispositive motion deadline of October 15, 2001, contained in the Court's Scheduling Order in this case. (D.I. 43).

Therefore, the Court will consider the sufficiency of the Plaintiff's damages claims when it addresses the merits of the Plaintiff's negligence claim. Accordingly, the motion to dismiss Mr. Galentine's damages claims will be dismissed as untimely filed. Further, the Court notes that Mr. Galentine is not in violation of the Court's October 22, 2002 Order because accepting his declaration as true, he lost all receipts and inventories in the fire on September 2, 1997, or when he divorced and moved out of his marital home. Thus, there was no further documentation that the Plaintiff could have produced.

## III. Applicable Legal Standard

■ The Court has already concluded that this case arises under the admiralty jurisdiction of the Court pursuant to 28 U.S.C. § 1333 (D.I. 95). The substantive law applicable in cases of admiralty jurisdiction is federal law. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959).

■ Under general federal maritime law, negligence is an actionable wrong. *Leathers v. Blessing*, 105 U.S. 626, 26 L.Ed. 1192 (1882). In order to prevail on a claim of maritime negligence a plaintiff must prove that there was: 1) a duty of care which obliges the person to conform to a certain standard of conduct; 2) a breach of that duty; 3) a reasonably close causal connection between the offending conduct and the resulting injury; and 4) actual loss, injury, or damages suffered by the Plaintiff. 1 Thomas Schoenbaum, *Admiralty and Maritime Law* § 5-2 at 170 (3d ed.2001) (footnotes omitted).

■ Generally, in admiralty, the duty of care may be derived from: 1) duly enacted laws, regulations, and rules; 2) custom; or 3) the dictates of reasonableness and prudence. *See Pennsylvania R. Co. v. The Marie Leonhardt*, 202 F.Supp. 368, 375 (E.D.Pa.1962), *aff'd*, 320 F.2d 262 (3d Cir. 1963). Ultimately, the basic duty of care is reasonable care under the particular circumstances. *Admiralty and Maritime Law, supra*, § 5-2 at 170.

After establishing the applicable duty of care, a breach of that duty must be demonstrated. Such a breach is the failure to observe the degree of care, precaution, and vigilance which the circumstances demand. *Id.* at 173.

Proof that the wrongful act caused the alleged damage is essential to a negligence claim under the general maritime tort law. *Id.* at 175. Causation is a two part analysis composed of factual causation and proximate causation. *Id.* at 176. Factual causation asks whether the particular event would have occurred without an act or omission. *Id.* Proximate causation asks whether the damage was a reasonably foreseeable consequence of the defendant's act or omission. *Id.*

Finally, actual economic loss, injury, or damages suffered by the plaintiff must be specifically demonstrated. *Id.* at 170.

## IV. Discussion

### A. Duty

The Court concludes that the standard of care in this case is derived from the dictates of reasonableness and prudence in the particular circumstance. Thus, the applicable duty of care is the degree of caution that a prudent person would have used under the circumstances.[2] *See Penn-*

---

**2.** The Plaintiff, in his earlier papers, contended that the duty of care in this case is derived from the National Electric Code, N.F.P.A. # 70; however, the National Electric Code does not apply to marine vessels. The Code provides that it applies Coast Guard and American Yacht and Boating Association protocols for marine vessels. Tr. at 206:16–20. Plaintiff did not pursue this theory during the trial in this matter. (D.I. 87 at 11–12).

*sylvania R. Co. v. The Marie Leonhardt,* 202 F.Supp. 368, 375 (E.D.Pa.1962), *aff'd,* 320 F.2d 262 (3d Cir.1963); *Admiralty and Maritime Law, supra,* § 5–2 at 170. Therefore, Mr. Stekervetz owed a duty to Mr. Galentine, who had his vessel moored in an adjoining slip, to maintain his vessel, and its electrical wiring in the manner a reasonably prudent person would under the circumstances.

## B. Breach of Duty

 A breach of the duty of care can be proven by the failure to observe the degree of care, precaution, and vigilance which the circumstances demand. *Admiralty and Maritime Law, supra,* § 5–2 at 173. The Plaintiff contends in his Complaint that Mr. Stekervetz was negligent because: 1) he knew or should have known of the risk of a fire on his vessel because of a series of electrical short circuits that had occurred during the weeks preceding the fire; 2) he failed to equip his vessel with the appropriate fire protection equipment and/or detection devices; and 3) he failed to exercise ordinary care in preventing the fire from breaking out on his vessel and from spreading to adjacent vessels. However, in later papers submitted in this case, and at the bench trial, Plaintiff did not address allegations two and three cited above from his Complaint. Therefore, the Court will only address Plaintiff's allegation that Mr. Stekervetz breached his duty of care because he knew or should have known of the risk of a fire on the vessel because of a series of electrical short circuits that had occurred during the weeks preceding the fire.[3]

In regard to the allegation that Mr. Stekervetz knew or should have known of alleged electrical problems on his vessel, the Plaintiff contends that Mr. Stekervetz breached his duty of care in that he should have been aware that wiring in the dinette module on the port side of the vessel was improperly spliced. Plaintiff further contends that although Mr. Stekervetz was aware of electrical hazards on his vessel, he failed to repair those hazards. In order to establish Mr. Stekervetz's knowledge of his vessel's alleged electrical hazards, Plaintiff offered the testimony of himself and Mr. Eisenman, an appliance serviceman, who made a service call to the Stekervetz boat two weeks prior to the fire.

Mr. Eisenman testified that he received a service call from Mr. Stekervetz approximately two weeks before the fire. (Tr. at 51). He testified that he arrived at the Stekervetz vessel which was located in the Rehoboth Bay Marina to discuss a refrigeration problem between 2:00 and 4:00 p.m. on the day of the service call *Id.* at 52. Further, Mr. Eisenman testified that during the twenty minute meeting, William Stekervetz and Lisa Hertzog were present and they were both smoking and consuming beer on the vessel. *Id.* at 52. He also testified that he examined the refrigeration unit on the vessel where he determined that both voltages of the refrigeration controller were satisfactory, but also noted that there were indications that it had been changed and there was no output from the side that was supposed to supply the power to the actual refrigeration unit. *Id.* at 54–55. In addition, Mr. Eisenman testified that he did notice some physical

---

**3.** Also, in its Memorandum Order dated August 27, 2002, the Court stated that Plaintiff did not press forward with allegations two and three of his Complaint, and therefore, only addressed the first allegation that Mr. Stekervetz was negligent because he knew or should have known of the risk of fire on the vessel because of a series of electrical short circuits that occurred in the weeks preceding the fire. (See D.I. 90 at 7 n. 2). Further, this is the only allegation that the Plaintiff offered evidence on at the bench trial concerning Plaintiff's negligence claim.

indications of problems in the converter box or refrigeration unit where the color codes were consistent but the shades of color on the wiring were different which in his opinion showed that it was not the original wiring, as well as the fact that the wires were spliced by a wire nut reconnecting approximately six to eight wires rather than a normal sixteen to fourteen gauge wire butt connector. *Id.* at 56. He also testified that he observed the other electrical lines in the vessel but did not examine them in a professional manner. *Id.* at 60.

Mr. Eisenman stated that he informed Mr. Stekervetz and Lisa Hertzog that:

> [T]hey needed to address their electrical problems and do it as soon as possible. And that once they had taken care of that they could recontact me and I would be glad to solve the refrigeration problem ... My concern was reverse polarity on the AC current which nobody really touched on. A lack of grounding that could have caused that converter control to have been replaced the first time and that secondary unit had failed and I thought had I ordered a third controller and installed it on the refrigerator that I would have a third failure. But I also felt that based on the other problems that they had indicated to me I need not go further until they resolved these issues and I told them they shouldn't take the boat out and to get that addressed right away.

Tr. at 62–63.

Additionally, in regard to Mr. Stekervetz's purported knowledge of the allegedly defective wiring on his vessel, Mr. Galentine testified that Mr. Stekervetz was having alternator problems with his boat and had asked Mr. Galentine to examine the engine. (Tr. at 89). Mr. Galentine stated that when he looked at the alternator, he found that the wiring on the engine had been "tinkered with a lot", the wires were brittle, many of the connectors were broken and there was corrosion. (Tr. at 89–90). Further, Mr. Galentine testified that he suggested that Mr. Stekervetz have somebody examine the engine. (Tr. at 90). In addition, he testified that in the latter part of July 1997 or early August 1997, Mr. Stekervetz was having problems with the bilge pumps on his vessel, and as a result, his boat was partially submerged because his bilge pumps were not functioning. (Tr. at 90–91). Finally, Mr. Galentine testified that Mr. Stekervetz "was blowing fuses up at the main panel of the marina," because "he either had something that was arcing or surging [that was] exceeding that amperage to the panel" that set off the circuit breakers. (Tr. at 92–93). He explained that this event took power away from other boats on the dock and that there were outages frequently during the summer of 1997, where it would occur multiple times on a weekly basis and sometimes daily on weekends. (Tr. at 93).

Defendant's expert, William Daley testified that a recreational marine vessel owner's duty of care with regard to the electrical wiring system in his vessel is satisfied by obtaining an electrical inspection by a marine surveyor, which Mr. Stekervetz did. With minor exceptions, the surveyor indicated that the wiring was satisfactory and that the boat was operable. (Tr. at 204–205). Mr. Daley also testified that the applicable regulations for small recreational marine vessels can be found at 33 C.F.R. § 183, which deals with marine wiring and the standards and technical information issued by the American Boating Yacht Counsel ("ABYC"). (Tr. at 206). Further, Mr. Daley testified that these standards would be the base line by which marine surveyors and other inspectors of boats would proceed in any kind of an analysis of a boat. (Tr. at 206–207).

During cross-examination, Mr. Daley testified regarding the applicable regulations as they related to the wiring in the Stekervetz vessel. Specifically, he testified that under the Coast Guard regulations contained within 33 C.F.R. § 183 it is "not at all clear whether the regulations require the use of a junction box where spliced wires are joined together on board a vessel." (Tr. at 231). Mr. Daley testified that if you read a more extensive description in the ABYC standards, which cannot conflict with the Coast Guard regulations, it is sometimes appropriate to use a junction box where spliced wires are joined together on a vessel; however, the ABYC standards do not require that a junction box be used in all cases where wires are spliced. (Tr. at 231–232). Mr. Daley also testified regarding the probable effect of the partial submersion of the Stekervetz vessel allegedly due to the bilge pumps, where he explained that the materials that he reviewed, "did not indicate that there was any significant difference in the way the vessel operated after the intrusion." (Tr. at 209).

Based on the record evidence, the Court concludes that the Plaintiff has not met his burden of proving by a preponderance of the evidence that Mr. Stekervetz breached his duty of care with respect to the maintenance of his vessel's wiring system. The Court finds the testimony of William Daley to be the most persuasive on this issue. The Court finds Mr. Daley's extensive experience and educational background exceptional. Mr. Daley has been a mechanical engineer for Chesapeake Engineering and Design in Annapolis, Maryland for seven years. (Tr. at 169). Prior to that, he served as a commissioned officer in the United States Navy from 1975 till 1995, in various command positions. In his last three years of active duty with the Navy Mr. Daley was the associate chairman of the mechanical engineering department at the United States Naval Academy. (Tr. at 169). Mr. Daley earned a bachelor of science degree from the Naval Academy and a masters degree in aeronautical engineering from the Naval Postgraduate School. (Tr. at 170). Additionally, Mr. Daley is a registered Professional Engineer in the Commonwealths of Pennsylvania and Virginia and the State of Maryland. (Tr. at 170). He has performed between ten and fifteen marine inspections and accident reconstructions during his seven year tenure at Chesapeake Engineering and well over one hundred inspections during his tenure in the Navy. Mr. Daley has testified as an expert witness in court proceedings on issues related to marine inspection and safety approximately twenty-one times. (Tr. at 171–172).

At trial, Mr. Daley testified that the applicable electrical standards for small recreational marine vessels are 33 C.F.R. § 183 and the ABYC standards. He testified that an owner's standard of care with regard to electrical maintenance of small recreational boats is met with an inspection by a marine surveyor, which Mr. Stekervetz obtained, and with minor exceptions, indicated that the wiring was satisfactory and that the boat was operable. Mr. Daley testified that according to the Code of Federal Regulations and the ABYC standards that annotate them, a junction box is not required for spliced wires on a marine vessel. Crediting Mr. Daley's expert testimony over that offered by the Plaintiff including the testimony of Mr. Eisenman and the Plaintiff, the Court finds that the lack of a junction box to splice wires on the Stekervetz vessel is not a violation of any applicable standard, and therefore, not determinative of a breach of the duty of care. Likewise, based on Mr. Daley's testimony concerning the bilge pump failure and partial submersion testified to by Mr. Galentine, the Court finds that the operability of the vessel was not affected.

In crediting the testimony of Mr. Daley over the Plaintiff's, the Court recognizes that Mr. Galentine is very knowledgeable about the mechanical aspects of boats in general. However, the Court finds that his testimony regarding the corrosion of the wiring and power outages due to circuit tripping by the Stekervetz vessel unpersuasive on the issue of breach of the duty of care. First, the Court finds that Mr. Galentine lacks the background offered by Mr. Daley and is unfamiliar with the applicable standards for electrical wiring on small marine vessels.

Similarly, the Court finds that Mr. Eisenman is an experienced residential appliance serviceman, but he is not a licenced electrician and is not certified as a marine electrician. Also, Mr. Eisenman had no knowledge of the electrical wiring standards for small recreational marine vessels. (Tr. at 80). Although Mr. Eisenman testified that he advised Mr. Stekervetz not to take the boat out before the alleged electrical problems were solved, the Court cannot conclude that Mr. Stekervetz breached any duty of care he may have owed to the Plaintiff based on this testimony.

Lastly, the Court finds that a prudent person in Mr. Stekervetz's situation could have relied on an electrical inspection done by a marine surveyor less than *two months prior to the fire* which found that with minor exceptions, the wiring on his vessel was satisfactory.

## C. Causation

■ Even if the Court found that Mr. Stekervetz breached an applicable standard of care, the Court concludes that the Plaintiff has not met his burden with regard to the element of factual causation. In order to meet his burden with respect to causation, Plaintiff must demonstrate factual and proximate causation. *Admiralty and Maritime Law, supra*, § 5–2 at 176. Factual causation involves an inquiry into whether the event would have occurred in the absence of an act or omission. *Id.* Proximate causation involves an inquiry into whether the damage was a reasonably foreseeable consequence. *Id.*

The Plaintiff offered the expert deposition testimony of Frank Gaworksi in support of his theory of causation. Mr. Gaworski testified that he inspected the Stekervetz vessel on the morning of the fire with Randy Lee, Mike Ciancio and Russ Statz, who are employees of the Delaware State Fire Marshal's Office. (Gaworski Dep. at 20–21). This inspection lasted four and a half to five hours. (Gaworski Dep. at 32–33). Specifically, Mr. Gaworski testified that they inspected the wiring systems "from top to bottom", including the 120 volt and 12 volt wiring systems in the Stekervetz vessel by tracing every wire out to the location that it ended. (Gaworski Dep. at 20).

Mr. Gaworski testified that he could not find anything on the 12 volt wiring system that he could attribute as the cause of the fire. (Gaworski Dep. at 20). However, he testified that he did find a failure in the vessel's 120 volt wiring system in the dinette module in the port side of the vessel where wires were spliced together. (Gaworski Dep. at 21–22). Further, he testified that once the debris was removed from the area, the conductors where the wires were spliced did have electrical activity and "that was the only source of ignition at that point." (Gaworski Dep. at 22).

Mr. Gaworski testified that he did not make the determination that the cause and origin of the fire was the spliced wires on the port side of the vessel, rather he stated that Mike Ciancio, Russell Statz and Randy Lee made this determination and that he was unaware of the basis for their determination. (Gaworski Dep. at 22–23).

However, when Mr. Gaworski was probed further at his deposition as to the issue of causation by Mr. Jamie Jackson, Esq., the attorney representing the Estate of Lisa Hertzog, the following exchange occurred:

Q. Just so we're clear, the information in your report that you signed where it says, the fire occurred at a point where the cables were spliced together, is that information that was provided to you by Russell Statz and Randy Lee or is that something that you concluded as part of your investigation?

A. I concluded that the conductors had arcing on them. The splice that the conductors—the splice that was made did not have proper fittings for splicing the conductors together. Stranded conductors, they do not splice well without splicing devices.

Q. Were the spliced wires contained in any kind of junction box or enclosure?

A. It was the only place in the entire boat where they are not. No, they were not.

Q. And you described a little bit, but can you describe for me what the splicing of the wires looked like . . .

A. Yes. It was the 10–gauge stranded conductor that was just twisted together and taped . . . . It [came] into a receptacle—from what I could ascertain it [came] into a receptacle over by the eating areas. It left there and started heading towards the bath area, the head area, and from that point it headed to the kitchen area . . . .

Q. From your examination and inspection, sir, of the area of the wiring that was spliced together, was that contained within a floor board, a ceiling, or a wall? Were you able to tell?

A. It was contained within a storage compartment under the seat.

(Gaworski Dep. at 23–25). Finally, Mr. Gaworksi testified that it was the consensus of the group inspecting the Stekervetz vessel on the morning of September 2, 1997, that the cause and point of origin of the fire was where the wires were spliced together in the dinette module, on the port side of the vessel and that to his knowledge that conclusion had not changed as of the date of the deposition on August 8, 2001. (Gaworski Dep. at 33).

The Defendant offered the testimony of Mr. Daley on the causation issue. Mr. Daley inspected the Stekervetz vessel on Monday, May 12, 2003 in Dagsboro, Delaware where the Stekervetz vessel has been stored since 1997. (Tr. at 173). Originally, Mr. Carlson who was previously employed by Chesapeake Engineering and Design in Annapolis had inspected the vessel and prepared a report concerning the point of origin of the fire on the Stekervetz vessel in November, 2002. However, because Mr. Carlson was unavailable, Mr. Daley testified that he conducted his own inspection to determine the point of origin of the fire. In addition to inspecting the Stekervetz vessel, Mr. Daley testified that he reviewed the following: 1) the Delaware State Fire Marshal's report of the fire; 2) the report of Frank Gaworski relating to the fire; 3) the declaration of Frank Gaworski related to his inspection and analysis of the fire; 4) the deposition of the marine surveyor, Kenneth Henry; 5) the survey report and a sea trial report of Mr. Henry; 6) the deposition of Mr. Eisenman; 7) the appropriate standards from the Code of Federal Regulations and the ABYC Standards; and 9) Mr. Carlson's report concerning the point of origin of the fire. (Tr. at 173).

Based on his inspection of the vessel and the above cited materials, Mr. Daley testified that the point of origin of the fire on the Stekervetz vessel was clear, however, the particular cause of the fire was not clear. (Tr. at 175). He explained that the damage on the Stekervetz vessel was such

that a person could determine the burn patterns, but could not determine, based on the extensive damages, what the cause of the fire and damage was. (Tr. at 175). Based on the physical damage and the burn patterns on the vessel, Mr. Daley opined that the origin of the fire was in the "salon area on the starboard side, just aft of the cabin and bulkhead leading to the burning part." (Tr. at 176). Mr. Daley testified that in fire origin, there is generally a "V" pattern to the origin, where the point of the "V" points to the origin. In Mr. Daley's opinion, all of the photographs admitted into evidence demonstrate that the origin of the fire was on the starboard side, approximately in the head area. (Tr. at 181).

Mr. Daley based his opinion on several features of the Stekervetz vessel. First, he testified that if you were to examine photographs of both the port and starboard sides of the Stekervetz vessel, the hull itself as opposed to the interior surfaces of the vessel, you will notice a deep "V" burn pattern in the head area on the starboard side. (Tr. at 176). Mr. Daley further testified that in the photographs, the "V" burn pattern goes down to the "wetted waterline" as opposed to the "painted waterline" where the burn pattern goes down to the water mark on the side of the vessel and then stops, because it was impeded by the water. (Tr. at 176–177). Moreover, Mr. Daley testified that the burn pattern then extended aft and forward on the starboard side. (Tr. at 177).

Mr. Daley testified that an inspection of the port side of the Stekervetz vessel reveals that,

the only evidence of fire is a minor bit of fire above the rub rail, and the rub rail on this vessel is fairly close to the gunnel of the vessel. A minor amount of burning above the rub rail. There are three port lights on the port side; two are in the berth area and one is behind some shelving in the dinette area of the port side.

There is some charring coming out of the port lights on the port bow areas. The third port light as it is sheltered by the dinette area and the shelving and the sink, that window is still there, it's blistered. So based on the extent of the fire it is my opinion that it occurred on the starboard side and then internally moved over to the port side. But given the lack of burning on the outside hull on the port side, it would be difficult for me to understand how the fire could have *started* in that vicinity.

Tr. at 177–178 (emphasis added). Citing the photographs admitted into evidence, Mr. Daley testified in detail concerning the burn patterns. Specifically, Mr. Daley testified that the first photograph [4] shows the port side, the three port lights on the port side, where the first and second lights are in the berth area of the vessel and the third is partially or completely sheltered by the shelving in the kitchen area and also demonstrates some burn pattern where the plastic glass on the lights melted where the flames exited. (Tr. at 179; Def. Ex. 3). Mr. Daley explained that the photograph illustrates that the plastic window on the port side was distorted, but still in place, and also illustrates that the gel coat in general on the port side of the

---

4. The photographs admitted into evidence on behalf of the Defendant were taken by Mr. Carlson on October 18, 2002, in Dagsboro, Delaware where the Stekervetz vessel has been stored in the exterior since 1997. During direct testimony, Mr. Daley stated that based on his inspection and the photographs that he took on May 12, 2003, the Stekervetz vessel was in the same exact position, in the same facility and is representative as of May 12, 2003 of what is depicted in the photographs taken in October and admitted into evidence. (Tr. at 181).

vessel, while powdery from being stored exterior since 1997, is still in tact and in good appearance, with the exception of the most aft port light where the gel coat is cracked. (Tr. at 179; Def. Ex. 3).

On the other hand, Mr. Daley explained, the first photograph shows charring on the starboard side which extends up to the nose, within approximately a foot of the nose, and at the wetted water line. Moreover, Mr. Daley testified that this photograph details the burn pattern on the starboard side, where the burn pattern is through the resin of the hull and exposes the fiberglass cloth underneath the vessel, demonstrating that the fiberglass cloth and all the wood backing inside the vessel on the starboard side were physically burned. (Tr. at 180; Def. Ex. 3).

Mr. Daley compared photographs of the dinette module on the port side of the vessel with photographs of the starboard side head module. (Tr. at 182; Def. Ex. 5). In the photograph of the dinette module on the port side, Mr. Daley testified that there was a sink, a faucet, a refrigerator frame and various shelving and counter top space. (Tr. at 182). He pointed out that a significant portion of the plywood framing still exists, along with a significant portion of the shelving and the rear portion of the counter top. (Tr. at 182; Def. Ex. 5). Mr. Daley testified that the picture on the same page which depicts the starboard side of the head module shows that the framing is burned down to the plywood decking of the salon area and very little if any of the plywood from the head module still exists. (Tr. at 183; Def. Ex. 5). In sum, Mr. Daley concluded unequivocally that based on the physical evidence of the fire's burn pattern and the damage to the port and starboard areas of possible origin, the fire started on the starboard side in the salon/head area and not the port side.

In reference o Mr. Gaworski's opinion about the point of origin of the fire, Mr. Daley testified that the physical evidence clearly supports an origin on the starboard side of the vessel rather than the port side as Mr. Gaworski opined. Mr. Daley explained that if Mr. Gaworski's opinion about the origin of the fire was correct, than the burn pattern is inconsistent with his proffered origin because the deepest burning is two-thirds the width of the vessel away from his proffered origin, yet within one-third of that proffered point there is significant burnable material that still exists such as plywood and two-thirds the distance away, the area is basically all-consumed. (Tr. at 189). Finally, Mr. Daley testified that the physics of the burn pattern are inconsistent with Mr. Gaworski's opinion, because a fire cannot "jump" and ignore certain areas. (Tr. at 189).

The Court finds Mr. Daley's opinion as to the origin of the fire the most persuasive evidence on the location of the fire's origin. Although Mr. Daley was unable to offer an opinion as to the cause of the fire, the Court finds that his opinion and the evidence he offered in support of his opinion is sufficient to rebut the Plaintiff's contention that the cause of the fire was the improperly spliced wires on the port side of the vessel.

Accordingly, the Court concludes that Plaintiff has not met his burden with regard to causation. Plaintiff pursued and offered evidence supporting a single theory for the cause and origin of the fire; the spliced wires on the port side of the vessel, which the Court finds he has failed to prove by a preponderance of the evidence. An Order entering Judgment in favor of the Defendant and against the Plaintiff will be entered.

### ORDER

NOW THEREFORE, for the reasons set forth in the Opinion issued this date,

IT IS HEREBY ORDERED this 22nd day of July 2003, that:

1) Defendant's Motion in Limine for Failure to Produce an Expert for Deposition (D.I. 118) is **DENIED** as moot;

2) Defendant's Motion in Limine to Dismiss Plaintiff's Claims for Personal Property and Equipment Damages (D.I. 119) is **DENIED;**

3) Defendant's Motion in Limine to Strike the Expert Testimony of Frank Gaworski (D.I. 120) is **DENIED.**